**WASHINGTON LEGAL FOUNDATION, et al., Plaintiffs, Appellants,**

**v.**

**MASSACHUSETTS BAR FOUNDATION, et al., Defendants, Appellees.**

No. 92–1775.

United States Court of Appeals, First Circuit.

Heard Jan. 8, 1993.

Decided May 20, 1993.

---

Richard A. Samp, with whom Daniel J. Popeo, John C. Scully, and Francis C. Newton, Jr. were on brief, for plaintiffs, appellants.

Allan van Gestel, with whom James C. Rehnquist, John C. Kissinger, Jr., and Goodwin Procter & Hoar were on brief, for Massachusetts Bar Foundation, William W. Porter, Asst. Atty. Gen., and Scott Harshbarger,

Atty. Gen., on brief for Massachusetts IOL-TA Committee, Donald K. Stern, S. Tara Miller, and Hale and Dorr on brief for Boston Bar Foundation, Joseph L. Kociubes, Stephanie A. Kelly, Diane E. Cooley, and Bingham, Dana & Gould on brief for Massachusetts Legal Assistance Corp., defendants, appellees.

William W. Porter, Asst. Atty. Gen., and Scott Harshbarger, Atty. Gen., on brief for The Chair of Massachusetts Bd. of Bar Overseers, defendant, appellee.

William W. Porter, Asst. Atty. Gen., and Scott Harshbarger, Atty. Gen., on brief for The Justices of Massachusetts Supreme Judicial Court, defendants, appellees.

Peter M. Siegel, Randall C. Berg, Jr., and Arthur J. England, Jr., and Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A. on brief for Alabama Law Foundation, Inc., Alabama State Bar, Arkansas IOLTA Foundation, State Bar of Arizona, Arizona Bar Foundation, The State Bar of California, The Legal Services Trust Fund Com'n of State Bar of California, Colorado Bar Ass'n, Colorado Lawyer Trust Account Foundation, Connecticut Bar Foundation, Connecticut Bar Ass'n, Delaware Bar Foundation, Delaware State Bar Ass'n, The Florida Bar, The Florida Bar Foundation, Georgia Bar Foundation, State Bar of Georgia, Hawaii Bar Foundation, Hawaii State Bar Ass'n, Idaho Law Foundation, Inc., Idaho State Bar, Illinois State Bar Ass'n, Lawyers Trust Fund of Illinois, The Iowa State Bar Ass'n, Kansas Bar Foundation, Kentucky IOLTA Fund, Louisiana State Bar Ass'n, Maine Bar Foundation, Maine State Bar Ass'n, Maryland Legal Services Corp., Maryland State Bar Ass'n, Inc., State Bar of Michigan, Michigan State Bar Foundation, Inc., Minnesota Lawyer Trust Account Bd., The Missouri Bar, Missouri Lawyer Trust Account Foundation, Nat. Ass'n of IOLTA Programs, Inc., Nat. Legal Aid & Defender Ass'n (NLADA), Nevada Law Foundation, New Hampshire Bar Ass'n, New Hampshire Bar Foundation, New Jersey State Bar Ass'n, New Jersey State Bar Foundation, The IOLTA Fund of the Bar of New Jersey, New Mexico Bar Foundation, New York State Bar Ass'n, Interest on Lawyer Account Fund of the State of New York, North Carolina Bar Ass'n, North Carolina State Bar Plan for Interest on Lawyers' Trust Accounts, State Bar Ass'n of North Dakota, Ohio Legal Services Program of Ohio Public Defender Com'n, Oklahoma Bar Foundation, Inc., Oregon Law Foundation, Oregon State Bar, Pennsylvania Bar Ass'n, Lawyer Trust Account Bd. [Pennsylvania], Philadelphia Bar Ass'n, Rhode Island Bar Foundation, Seattle–King County Bar Ass'n, South Carolina Bar, The South Carolina Bar Foundation, South Dakota Bar Foundation, Tennessee Bar Ass'n, Tennessee Bar Foundation, Texas Equal Access to Justice Foundation, State Bar of Texas, Utah Bar Foundation, Utah State Bar, Vermont Bar Ass'n, Vermont Bar Foundation, The Virginia Bar Ass'n, Virginia Law Foundation, Virginia State Bar, Washington State Bar Ass'n, Legal Foundation of Washington, West Virginia Bar Foundation, Inc., West Virginia State Bar, amici curiae.

J. Michael McWilliams, Dennis A. Kaufman, and John H. Morrison on brief for The American Bar Ass'n, amicus curiae.

Gerald B. Gallagher, on brief pro se, amicus curiae.

Kathleen McDonald O'Malley, Chief Counsel, Patrick A. Devine, Asst. Atty. Gen., Lee Fisher, Atty. Gen., of Oh., Winston Bryant, Atty. Gen., of Ark., Richard Blumenthal, Atty. Gen., of Conn., Larry EchoHawk, Atty. Gen., of Id., Roland W. Burris, Atty. Gen. of Ill., Bonnie J. Campbell, Atty. Gen. of Ia., Michael E. Carpenter, Atty. Gen. of Me., J. Joseph Curran, Jr., Atty. Gen. of Md., Hubert H. Humphrey, III, Atty. Gen. of Minn., Mario J. Palumbo, Atty. Gen. of W.Va., Mike Moore, Atty. Gen. of Miss., Frankie Sue Del Papa, Atty. Gen. of Nev., Robert J. Del Tufo, Atty. Gen. of N.J., Tom Udall, Atty. Gen. of N.M., Nicholas J. Spaeth, Atty. Gen. of N.D., Earnest D. Preate, Jr., Atty. Gen. of Penn., Dan Morales, Atty. Gen. of Tex., Jeffrey L. Amestoy, Atty. Gen. of Vt., Robert Abrams, Atty. Gen. of N.Y., Charles W. Burson, Atty. Gen. of Tenn., Ken Eikenberry, Atty. Gen. of Wash., and Mary Sue Terry, Atty. Gen. of Va., on brief for the States of Oh., Ark., Conn., Id., Ill., Ia., Me., Md., Minn., Miss., Nev., N.J., N.M., N.Y., N.D., Penn., Tenn.,

Tex., Vt., Wash., W.Va., and Va., amici curiae.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOWNES, Senior Circuit Judge.

This appeal involves a challenge to the Massachusetts Interest on Lawyers' Trust Accounts ("IOLTA") program. The district court granted the defendants' motion to dismiss the plaintiffs' claims that the IOLTA program violated their First Amendment rights of freedom of speech and association, and effected a taking of their property in violation of the Fifth and Fourteenth Amendments, 795 F.Supp. 50 (1992). We affirm.

## I.

### BACKGROUND

Traditionally, in Massachusetts and in other states, clients' funds which lawyers held for a short term or in nominal amounts were deposited into non-interest bearing pooled trust accounts. *See, e.g., In re Mass. Bar Ass'n,* 395 Mass. 1, 478 N.E.2d 715, 716 (1985); *In re Minn. State Bar Ass'n,* 332 N.W.2d 151, 155–56 (Minn.1982). Banking laws and the ethical obligation of lawyers to maintain clients' funds so that they were immediately available for reimbursement prevented such pooled trust accounts from accruing interest. *Cone v. State Bar of Fla.,* 819 F.2d 1002, 1005 (11th Cir.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987). Interest earned by pooled trust accounts remained with the banking institution which held the funds. *Id.* With the advent of Negotiable Order of Withdrawal ("NOW") accounts authorized by the Consumer Checking Account Equity Act, interest became available on checking accounts for eligible depositors. *Id.* at 1005–06. Eligible depositors include individual owners of deposited funds and certain charitable, non-profit or public interest entities including IOLTA programs. *See id.; In re N.H. Bar Ass'n,* 122 N.H. 971, 453 A.2d 1258, 1259 (1982). Dur-

ing the late 1970's and through the 1980's, Florida and many other states proposed IOLTA programs and courts upheld the programs finding them constitutionally and ethically permissible.[1] As of January, 1992, forty-nine states and the District of Columbia had authorized IOLTA programs. ABA/BNA Lawyers' Manual on Professional Conduct 45:202 (1992). Indiana remains the only state which has not adopted an IOLTA program. *Id.; In re Public Law No. 154–1990,* 561 N.E.2d 791 (Ind.1990); *In re Ind. State Bar,* 550 N.E.2d 311 (Ind.1990).

The Massachusetts IOLTA program was established by amendment to Canon 9, DR 9–102 of Rule 3:07 of the Rules of the Supreme Judicial Court, effective September 1, 1985, the "IOLTA Rule." *Mass. Bar Ass'n,* 478 N.E.2d at 720–21. From 1985 until 1990, the IOLTA program operated as a voluntary system. Attorneys could elect to participate by establishing an interest-bearing IOLTA account and by complying with DR 9–102(C) requirements which included choosing a recipient charity from a group designated by the IOLTA Committee.

In 1989, the Massachusetts Supreme Judicial Court ("SJC") converted the voluntary IOLTA program into a mandatory program by amending the IOLTA Rule, effective January 1, 1990. As amended, the rule required all Massachusetts lawyers to deposit client funds into interest bearing accounts: either (1) a pooled IOLTA account if, in the judgment of the lawyer, the deposits were nominal in amount or to be held for only a short period of time; or (2) individual accounts for all other client funds. The Rule required lawyers or law firms to direct the banks holding their IOLTA accounts to disburse accrued interest to a charitable entity selected by the lawyer or firm from a group designated by the SJC. The designated charities were Massachusetts Legal Assistance, the Massachusetts Bar Foundation, and the Boston Bar Foundation.

---

1. *See, e.g., Cone,* 819 F.2d 1002; *In re Interest on Trust Accounts,* 402 So.2d 389 (Fla.1981); *In re Ark. Bar Ass'n,* 293 Ark. 511, 738 S.W.2d 803 (1987); *Mass. Bar Ass'n,* 478 N.E.2d 715; *Carroll v. State Bar of California,* 166 Cal.App.3d 1193, 213 Cal.Rptr. 305 (4th Dist.), *cert. denied sub nom. Chapman v. State Bar of Calif.,* 474 U.S. 848, 106 S.Ct. 142, 88 L.Ed.2d 118 (1985); *In re Interest on Lawyers' Trust Accounts,* 672 P.2d 406 (Utah 1983); *N.H. Bar Ass'n,* 453 A.2d 1258; *Minn. State Bar Ass'n,* 332 N.W.2d 151.

The SJC again amended the IOLTA Rule, effective January 1, 1993, to change the process for disbursement of IOLTA funds.[2] The IOLTA Rule now vests responsibility for disbursement of IOLTA funds in the IOLTA Committee and eliminates choice by lawyers of recipient eligible charities. The IOLTA Committee must disburse sixty-seven percent of all IOLTA funds to Massachusetts Legal Assistance and the remaining thirty-three percent to "other designated charitable entities."

The parties have not briefed or argued any issues in the context of the 1993 amendment to the IOLTA Rule.[3] Although the amendment of the IOLTA Rule affects the process of funds disbursement, the changes are not material to this decision. None of the parties argued that the lawyers' choice of recipient charities, as provided by the 1990 version of the IOLTA Rule, was significant. The funds are still disbursed primarily to Massachusetts Legal Assistance with the remainder to "other designated eligible charities" which are still the Massachusetts Bar Foundation and the Boston Bar Foundation. In addition, the mission of IOLTA funds remains the same: "The Massachusetts Legal Assistance Corporation may use IOLTA funds to further its corporate purpose and other designated charitable entitles [sic] may use IOLTA funds either for (1) improving the administration of justice or (2) delivering civil legal services to those who cannot afford them." Mass.Sup.J.C.R. 3:07, DR 9–102(C), *as amended by* Order 92–18, effective Jan. 1, 1993. The corporate purpose of the Massachusetts Legal Assistance Corporation is to

> provid[e] financial support for legal assistance programs that provide representation to persons financially unable to afford such assistance in proceedings or matters other than criminal proceedings or matters, except those proceedings or matters in which the commonwealth is required to provide representation.

Mass.Gen.L. ch. 221A, § 2 (West Supp.1992).

Unless further designation is necessary for clarity, we will refer to the currently effective Massachusetts Supreme Judicial Court Rule 3:07, DR 9–102(C) as "DR 9–102(C)" or the "IOLTA Rule."

### A. *The Plaintiffs' Claims*

There are five plaintiffs in this action. The Washington Legal Foundation ("WLF") is a non-profit, public interest law and policy center operating in Washington, D.C. Karen Parker is a citizen of Massachusetts who has employed lawyers in connection with her real estate business and other businesses, which has resulted in her money being deposited in IOLTA accounts. Stephanie Davis is a citizen of Massachusetts who has not had her money placed in IOLTA accounts, but she anticipates that, in the future, she may need to hire an attorney which would cause her money to be deposited in an IOLTA account. William R. Tuttle is an attorney practicing in Abington, Massachusetts, without an IOLTA account. Timothy J. Howes is an attorney in Springfield, Massachusetts, where he maintains an IOLTA account in the Shawmut Bank. Howes is suing on behalf of himself and on behalf of his clients whose funds are deposited in his IOLTA account.

The defendants are the Massachusetts Bar Foundation, the Boston Bar Foundation, the Massachusetts Legal Assistance Corporation, Katherine S. McHugh (in her capacity as chair of the Massachusetts IOLTA Committee), Fran F. Burns (in his capacity as chair of the Board of Bar Overseers), and the Justices of the Supreme Judicial Court of Massachusetts. The plaintiffs allege, pursuant to 42 U.S.C. § 1983, that they have been deprived, under color of state law, of their rights secured by the First, Fifth and Fourteenth Amendments of the Constitution by operation of the Massachusetts IOLTA program.

#### 1. *Count One: First and Fourteenth Amendments*

WLF alleges that it sent a check to cover costs and expenses related to this legal ac-

---

**2.** The Massachusetts Supreme Judicial Court amended Rule 3:07, DR 9–102(C) by Order 92–18, effective January 1, 1993. A copy of DR 9–102 and the amendment appear in the appendix following this opinion.

**3.** The Massachusetts Attorney General's Office sent this court a copy of the amendment to DR 9–102(C) by letter dated February 12, 1993.

tion to a Massachusetts attorney (not a party to the action) who deposited the check in his IOLTA account as required by the IOLTA Rule. Parker alleges that she has and will continue to use lawyers in connection with her real estate business and that her funds deposited with lawyers have and will be deposited in IOLTA accounts. WLF and Parker allege that:

> The collection of and use of interest, under color of state law, generated from the IOLTA trust account of [their attorneys] for litigation, especially for litigation that involves political or ideological causes, and for legislative or other forms of lobbying, deprive [them] of their rights to freedom of speech and association guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.

Davis alleges that although she has not yet had money deposited in an IOLTA, the IOLTA Rule creates "the risk that she will be forced to choose between employing an attorney or financially supporting organizations with which she disagrees." Davis alleges her constitutional claims in substantially similar terms to those quoted above. Attorney Howes alleges that he has had to deposit client funds in his IOLTA as required by the IOLTA Rule and that the Rule "forces [him] to choose between not practicing law and or [sic] practicing law and associating with organizations whose actions offend his political and ideological beliefs and thereby depriving him of his right to freedom of speech and association as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." Finally, Attorney Tuttle alleges that the IOLTA Rule has forced him "to forego, to his professional and financial detriment, depositing certain client funds into non-interest bearing accounts in order to avoid associating with organizations whose actions offend his political and ideological beliefs" thereby depriving him of the same constitutional rights as alleged by Attorney Howes.

In summary, Count I alleges violation of the plaintiffs' rights of freedom of speech and association.

### 2. *Count Two: Fifth and Fourteenth Amendments*

■ Plaintiffs WLF and Parker allege that the IOLTA Rule constitutes an illegal taking of the beneficial use of their funds for public use without just compensation and without due process of law in violation of the Fifth and Fourteenth Amendments to the Constitution.[4] Howes makes the same claim on behalf of his clients whose funds he has deposited into his IOLTA account. Neither Davis, Howes (on his own behalf) nor Tuttle make claims under Count II.

### 3. *Relief Requested*

The plaintiffs ask for declaratory and injunctive relief to dismantle the operation of the mandatory IOLTA program. Specifically, the plaintiffs request that the court: (1) require the defendants to refund the interest which has been earned on their funds while in IOLTA accounts; (2) declare the IOLTA Rule void as an unconstitutional violation of the plaintiffs' First, Fifth and Fourteenth Amendment rights; (3) issue permanent injunctions prohibiting the defendants from requiring attorneys to comply with the IOLTA Rule and from disciplining attorneys for failure to comply with the IOLTA Rule; (4) issue a permanent injunction directing the SJC to require attorneys to make full disclosure to their clients of uses of IOLTA funds if the attorney elects to participate in IOLTA, and (5) grant reasonable attorneys fees to the plaintiffs pursuant to 42 U.S.C. § 1988.

---

4. The plaintiffs have not pursued their claims alleged in Count III based on the Fourteenth Amendment that the IOLTA program has unconstitutionally deprived them of their property without due process of law. The plaintiffs' statement of issues on appeal is limited to the constitutional rights of the plaintiffs under the First and Fifth Amendments. Therefore, we assume that the plaintiffs' claims under the Fourteenth Amendment have been abandoned and are waived. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990). Of course, the Fourteenth Amendment is properly included in each count as the basis upon which the First and Fifth Amendment prohibitions apply to the states.

### B. Dismissal of Claims

The defendants moved to dismiss the plaintiffs' action on the grounds that their constitutional claims lacked merit and that some of the plaintiffs lacked standing.[5] The district court found that there was no serious dispute that at least two of the plaintiffs, Parker and Howes, had standing to bring their constitutional claims. The district court dismissed the plaintiffs' claims holding "that the plaintiffs have no property interest in the funds subject to the SJC Rule," and that the SJC Rule did not compel association with speech and "speech, in the constitutional sense, is not a factor of the challenged SJC Rule." *Washington Legal Found. v. Mass. Bar Found.*, 795 F.Supp. 50, 53, 56 (D.Mass. 1992). The plaintiffs appeal the district court's dismissal of their claims.

### C. Standard of Review

Our standard of review of a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is well established. We begin by accepting all well-pleaded facts as true, and we draw all reasonable inferences in favor of the appellants. *Coyne v. City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.1992). Because a dismissal terminates an action at the earliest stages of litigation without a developed factual basis for decision, we must carefully balance the rule of simplified civil pleading against our need for more than conclusory allegations. *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir.1982), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983). Because only well-pleaded facts are taken as true, we will not accept a complainant's unsupported conclusions or interpretations of law. *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir.1992) ("a reviewing court is obliged neither to 'credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation,' . . . nor to honor subjective characterizations, optimistic pre-

dictions, or problematic suppositions." (citations omitted)). We may affirm the district court's order on any independently sufficient grounds. *Willhauck v. Halpin*, 953 F.2d 689, 704 (1st Cir.1991).

### D. Standing

The issue of standing has not been raised by the parties on appeal, and therefore we address standing only because it presents a threshold jurisdictional question. *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) ("every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." (citations omitted)); *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("[Standing] is the threshold question in every federal case, determining the power of the court to entertain the suit."). Standing requirements are most strictly enforced in cases involving constitutional questions. *Bender*, 475 U.S. at 541–42, 106 S.Ct. at 1331–32.

The standing doctrine is derived from Article III of the Constitution which requires the existence of a "case or controversy" before a claim may be resolved by judicial process. *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). To show a case or controversy, a plaintiff must first "clearly demonstrate that he has suffered an 'injury in fact[ ]' " which means "an injury to himself that is 'distinct and palpable,' . . . as opposed to merely '[a]bstract,' . . . and the alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.' " *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (citations omitted). Second, the claimant must allege facts which show "that the injury 'fairly can be traced to the challenged action' and, third, 'is likely to be

---

5. On appeal, the record includes only the defendants' bare motion to dismiss which states the grounds as lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. The district court summarized the defendants' grounds for the motion to dismiss: "In addition to arguing that the plaintiffs' constitu-

tional challenges are without merit, the defendants contend that two plaintiffs lack standing." *Washington Legal Found.*, 795 F.Supp. at 52, n. 3. We assume, therefore, that the defendants' assertion of lack of subject matter jurisdiction referred to lack of standing.

redressed by a favorable decision.'" *Id.* (quoting *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976) and *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *see also Rumford Pharmacy v. City of East Providence,* 970 F.2d 996, 1001 (1st Cir.1992); *AVX Corp.,* 962 F.2d at 113. Our standing inquiry depends on whether the plaintiffs have established the existence of a case or controversy as to each of their claims, but does not involve the merits of particular claims. *Warth,* 422 U.S. at 500, 95 S.Ct. at 2206.

The district court found that at least Howes and Parker had standing to bring the constitutional challenges in this case. Karen Parker alleges that she has and will continue to employ lawyers for transactions related to her business and that she has and will have her funds placed in IOLTA accounts by the lawyers she employs. She claims that the IOLTA program collects and uses for political and ideological causes interest generated by her funds placed in IOLTA accounts, and therefore the operation of the IOLTA program deprives her of freedom of speech and association in violation of the First Amendment. Parker also claims that the IOLTA program constitutes an illegal taking of the beneficial use of her funds deposited in IOLTA accounts in violation of the Fifth Amendment. She asks this court to declare the IOLTA Rule unconstitutional and to enjoin the operation of the rule. Based upon her allegations, which we take as true for this purpose, she has stated an actual injury to herself which is traceable to the IOLTA rule and which may be remedied by the relief sought. We agree with the district court that Parker has standing to maintain her claims made in this action.

Howes presents a more complex standing situation. Howes brings the First Amendment claim on his own behalf and on behalf of his clients, and the Fifth Amendment claim only on behalf of his clients.[6] As to the First Amendment claim on his own behalf, Howes alleges that he has been compelled by the IOLTA Rule to participate in the IOLTA program and thereby to associate with IOLTA funded organizations which offend his political and ideological beliefs. Howes also alleges that the operation of the IOLTA Rule forces him to choose between practicing law and not practicing law. He asks for the same relief requested by Parker. Without addressing the merits of Howes' personal claims, we find that he has alleged an injury which may be remedied by the requested relief which is sufficient to establish his standing to maintain his First Amendment claim.

Because we find that at least two of the plaintiffs, Parker, a client, and Howes, a lawyer, have standing to maintain each claim, we need not address the standing of all plaintiffs as to each claim. *Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Buckley v. Valeo,* 424 U.S. 1, 12, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976) (finding appellants had standing because "at least some of the appellants have a sufficient 'personal stake' in a determination of the constitutional validity of each of the challenged provisions to present 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character'" (citation and footnote omitted)). We find, therefore, that based on Parker's and Howes' standing, we have jurisdiction in this case.

---

6. Howes' standing on behalf of third parties is more difficult. The general rule is that a plaintiff has standing to assert only his own rights, not those of third parties. *Playboy Enterprises, Inc. v. Public Service Comm'n,* 906 F.2d 25, 36–37 (1st Cir.), *cert. denied, sub nom. Rivera Cruz v. Playboy Enterprises, Inc.,* 498 U.S. 959, 111 S.Ct. 388, 112 L.Ed.2d 399 (1990). An exception to the rule against *jus tertii* standing exists if other considerations, such as the representative's relationship with the third party and the opportunity of the third party to assert its own rights, overcome prudential concerns. *Id.* at 37. We do not address the third party standing issue, however, because it is unnecessary for our limited purpose of determining jurisdiction.

## II.

### ANALYSIS

The plaintiffs [7] allege that the Massachusetts IOLTA program violates their First Amendment rights by collecting the interest generated by clients' funds which are deposited in IOLTA accounts and distributing the money to designated organizations. The plaintiffs further allege that the recipient organizations use the money for litigation involving political or ideological causes and for lobbying. The IOLTA program, the plaintiffs allege, therefore compels them to support political and ideological causes depriving them of freedom of speech and association. The plaintiffs also allege that the IOLTA program's appropriation of interest from lawyers' trust accounts takes the beneficial use of client funds which constitutes an unconstitutional taking in violation of the Fifth and Fourteenth Amendments.[8]

A. *The Fifth Amendment Taking Claim*

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." There is no dispute that clients' money or property held by lawyers belongs to the clients and must be returned to the clients at their request. Mass.S.J.C. Rule 3:07, Cannon 9, DR 9-102(B)(4); Mass.Gen.L.Ann. ch. 221, § 51 (1986). Many courts, including the Supreme Judicial Court of Massachusetts, have held that clients do not have a constitutionally protected property right to the interest earned on IOLTA accounts.[9] *Mass. Bar Ass'n,* 478 N.E.2d at 718; *see also Cone,* 819 F.2d at 1007; *Carroll,* 213 Cal.Rptr. at 312; *Minn. State Bar Ass'n,* 332 N.W.2d at 158; *N.H. Bar Ass'n,* 453 A.2d at 1260–61. Perhaps in response, the plaintiffs have eschewed a right to the interest itself, and instead claim a property right to the beneficial use of their deposited funds, and more specifically, the right to control and to ex-

clude others from the beneficial use of those funds.

To make a cognizable claim of a taking in violation of the Fifth Amendment, the plaintiffs must first show that they possess a recognized property interest which may be protected by the Fifth Amendment. *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124–25, 98 S.Ct. 2646, 2659–60, 57 L.Ed.2d 631 (1978). The plaintiffs must point to credible sources for their claimed property interest:

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Intangible property rights, " 'the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it[,]' " which are recognized by state law are protected by the Takings Clause. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003, 104 S.Ct. 2862, 2873, 81 L.Ed.2d 815 (1984) (quoting *United States v. General Motors Corp.,* 323 U.S. 373, 377–78, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945)); *see also Bowen v. Gilliard,* 483 U.S. 587, 603–09, 107 S.Ct. 3008, 3018–21, 97 L.Ed.2d 485 (1987) (finding no unconstitutional taking of child's right to have support payments used for child's best interest by an amendment to the AFDC statute). Not all asserted property interests are constitutionally protected, however, as "a mere unilateral expectation or an abstract need is not a property interest entitled to protection." *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S.

7. As noted above, all of the plaintiffs do not join in all counts of the complaint. In addition, we have not resolved the standing of all plaintiffs. "Plaintiffs" as used throughout this opinion will refer to the particular plaintiffs making the claims discussed without resolving standing.

8. We address the plaintiffs' Fifth Amendment claim first, although it is raised in Count II of the plaintiffs' complaint, in order to resolve the

plaintiffs' property rights to funds deposited in IOLTA accounts before discussing the First Amendment claim which also involves that issue.

9. We accept as true, as do all of the parties, the assumption that there are no feasible accounting procedures which would allow individual client funds deposited into pooled accounts to earn net interest.

155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980).

### 1. *Beneficial Use of Deposited Funds*

The plaintiffs rely on trust law to establish their right to control the beneficial use of their funds as a protected property interest. IOLTA deposits do not require a trust agreement and the plaintiffs have not argued that formal trust agreements exist. Rather, the plaintiffs contend that because the acronym "IOLTA" includes the word "trust," a trust relationship is created between lawyer and client when client funds are deposited into IOLTA accounts. The relationship between lawyer and client in Massachusetts is fiduciary as a matter of law. *Markell v. Sidney B. Pfeifer Found., Inc.,* 9 Mass.App. 412, 402 N.E.2d 76, 94 (1980). The lawyer-client relationship presumes that the client trusts the lawyer to handle the client's funds appropriately and the lawyer assumes the fiduciary obligation subject to the regulation of the profession. We are not convinced that the deposit of clients' funds into IOLTA accounts transforms a lawyer's fiduciary obligation to clients into a formal trust with the reserved right by the client to control the beneficial use of the funds as claimed by the plaintiffs.

The plaintiffs also claim that they have a protected property right to exclude others from the beneficial use of their funds while they are deposited in IOLTA accounts. In support of the right to exclude, the plaintiffs rely on cases which have established that property owners have a right to exclude others from their real property. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435–36, 102 S.Ct. 3164, 3175–76, 73 L.Ed.2d 868 (1982). The plaintiffs have cited no sources which recognize a similar constitutionally protected property right to control or exclude others from intangible property and we have found none.[10]

### 2. *IOLTA Program Does Not Cause a Taking*

Assuming *arguendo* that the plaintiffs could establish their claimed property interests in the beneficial use of their funds subject to the IOLTA Rule, the IOLTA program does not cause an illegal taking of those interests. The analysis of Fifth Amendment takings claims has evolved through a series of cases in which Supreme Court decisions "engaging in ... essentially ad hoc, factual inquiries ... have identified several factors that have particular significance." *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. The Court has repeatedly used the significant factors enunciated in *Penn Central* to analyze takings claims: "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (citation omitted); *see also Hodel v. Irving,* 481 U.S. 704, 714–15, 107 S.Ct. 2076, 2082–83, 95 L.Ed.2d 668 (1987); *Kaiser,* 444 U.S. at 175, 100 S.Ct. at 390. The government may impose regulations to adjust rights and economic interests among people for the public good, as long as the government does not force "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); *see also Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979).

#### a. *Character of governmental action.*

The plaintiffs claim that the character of governmental action, through the IOLTA Rule, is a physical invasion of their beneficial interests in their funds held in IOLTA accounts. The physical invasion occurs, the plaintiffs argue, because the IOLTA program

---

**10.** The plaintiff has not discussed, and we do not find analogous, intangible property rights which, by their nature or by agreement, require the exclusion of others to preserve the property interest. *See, e.g., Monsanto, Co.,* 467 U.S. at 1002, 104 S.Ct. at 2872 ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others.").

borrows the principal to generate income by collecting the interest earned on IOLTA accounts. The plaintiffs do not claim that they have any rights to the interest, rather they assert the right to control who uses and benefits from the principal which generates the interest. The IOLTA program, the plaintiffs claim, "involves a permanent physical invasion of the funds" while they are held in IOLTA accounts.

The Supreme Court has recognized that a taking is more obvious when the governmental action can be characterized as a physical invasion. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. The Court has identified particular governmental action as categorical or *per se* takings which generally occur: (1) when government action compels property owners to acquiesce in permanent physical invasion or occupation of their private property, and (2) when "regulation denies all economically beneficial or productive use of land." *Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992); *see also Yee v. City of Escondido, Cal.,* —— U.S. ——, ——, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992).

The plaintiffs argue that the IOLTA program causes a physical taking similar to the takings found in *Kaiser*, 444 U.S. 164, 100 S.Ct. 383; *Loretto*, 458 U.S. 419, 102 S.Ct. 3164; and *Webb's*, 449 U.S. 155, 101 S.Ct. 446. In *Kaiser*, owners of a private marina, who had connected their private pond to the Pacific Ocean, challenged the federal government's imposition of a navigational servitude on their property requiring that they allow a right of access to the public. The Court found that the government's regulation of the marina amounted to a physical invasion of their private property by the public, and was, therefore, an unconstitutional taking of the marina owners' right to exclude others from their private property. *Kaiser*, 444 U.S. at 180, 100 S.Ct. at 393.

In *Loretto*, 458 U.S. 419, 102 S.Ct. 3164, government regulation required private property owners to allow conduits for cable television to be attached to their buildings even when the property owners did not subscribe to cable television. The Court found that the regulation authorized a physical oc-

cupation, however small, of the plaintiff's private property which was unconstitutional without compensation.

We find no logical analogy between the physical invasion of real property, as in *Kaiser* and *Loretto*, and the operation of the IOLTA Rule. The plaintiffs' takings claim involves intangible property rights not real property. To bolster their claim of physical invasion, the plaintiffs contend that their property rights are nearly identical to the claimants' property rights in *Webb's*, 449 U.S. 155, 101 S.Ct. 446, in which the Court stated "the [government's] appropriation of the beneficial use of the fund is analogous to the appropriation of the use of private property." *Id.* at 163–64, 101 S.Ct. at 452.

In *Webb's*, 449 U.S. 155, 101 S.Ct. 446, the Supreme Court struck down, as an unconstitutional violation of the Fifth Amendment Takings Clause, a Florida statute which required county clerks to deposit interpleaded funds in interest bearing accounts and retain the accrued interest. Another Florida statute provided for a separate fee to be paid to the county registry for holding interpleaded funds. The Court first determined that claimants of the interpleaded funds had a property right to the deposited funds. *Webb's*, 449 U.S. at 161–62, 101 S.Ct. at 451. Applying the general rule that interest follows the principal, the Court held that the claimants had a property right to the interest accrued on the interpleaded funds. *Id.* The Court concluded that there was not sufficient justification for the county to take the interest on interpleaded funds, which was the private property of the claimants, when the county registries were receiving fees for the costs related to holding the interpleaded funds. *Id.* at 164–65, 101 S.Ct. at 452–53.

Despite the some superficial similarities between *Webb's* and this case, there is a fundamental difference. In *Webb's*, the Court found that the claimants to the interpleaded fund had a recognized property right to the interest earned while the funds were held by the county registries. In this case, the plaintiffs do not have a property right to the interest earned on their funds held in IOLTA accounts. *See Cone*, 819 F.2d at 1006–07 (holding that plaintiffs had no right

to interest earned on IOLTA accounts and discussing implications of *Webb's* ). In fact, the plaintiffs recognize this and claim only the intangible rights related to the beneficial use of deposited funds: the right to control and exclude others. The property rights of the plaintiffs here and the claimants in *Webb's*, therefore, are different. The *Webb's* claimants had property rights to accrued interest which is tangible personal property, while plaintiffs in this case have claimed only intangible property interests.

The IOLTA program does not occupy or invade the plaintiffs' property even temporarily: the IOLTA program leaves the deposited funds untouched, the funds are always available to clients as required by DR 9–102(B)(4), and the interest earned on IOLTA accounts is not the plaintiffs' property. The property rights claimed by the plaintiffs are intangible. We find no logical or legal support for the plaintiffs' claim that the IOLTA program has caused a physical invasion and occupation of their intangible property rights.

### b. *Economic interference.*

Governmental action through regulation of the use of private property does not cause a taking unless the interference is significant. *Andrus*, 444 U.S. at 66–67, 100 S.Ct. at 327–28. Having found no weight to the plaintiffs' argument that governmental action through the IOLTA Rule has effected a physical invasion of their property rights, we consider the economic factors which are significant to a takings claim—the economic impact of the IOLTA Rule on the plaintiffs, and " 'the extent to which the regulation has interfered with distinct investment-backed expectations.' " *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026 (citations omitted).

The property rights claimed by the plaintiffs do not involve clients' economic interests. The claimed right to control and to exclude others from the beneficial use of funds held by lawyers has no economic benefit for the plaintiffs because clients would not otherwise be entitled to the interest earned on pooled accounts. Plaintiffs do not claim and there are no "investment-backed" expectations in the claimed rights of clients to control and exclude others from the beneficial use of deposited funds under these circumstances.

In sum, the plaintiffs claim, at best, a thin strand in the commonly recognized bundle of property rights. Under the IOLTA Rule, the plaintiffs retain the right to possess, use and dispose of the principal sum deposited in IOLTA accounts. "At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus*, 444 U.S. at 65–66, 100 S.Ct. at 327. Weighing the plaintiffs' claimed property rights against the bundle of rights remaining in their deposited funds left untouched by the IOLTA program, we find that the IOLTA Rule has not caused a taking of plaintiff's property. Consequently, we need not weigh any burden caused by taking private rights against the public benefit.

We affirm, albeit on different grounds, the district court's dismissal of Count Two of the plaintiffs' complaint.

### B. *The First Amendment Speech and Association Claim*

The plaintiffs claim that the IOLTA Rule compels lawyers, and therefore clients, to participate in the IOLTA program and thereby support lobbying and litigation for ideological and political causes. They contend that the IOLTA Rule violates their First Amendment rights of freedom of speech and association. The district court dismissed the plaintiffs' First Amendment claims on the grounds that (1) the IOLTA Rule did not compel the plaintiffs' participation in the IOLTA program, and (2) the IOLTA Rule did not involve constitutionally protected speech. We agree that the plaintiffs' First Amendment claim was properly dismissed.

The First Amendment protects the right not to speak or associate, as well as the right to speak and associate freely.[11] *Rob-*

---

11. The First Amendment provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the

erts v. United States Jaycees, 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984); Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977); West Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 633, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628 (1943). The Supreme Court has established that "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" Wooley, 430 U.S. at 714, 97 S.Ct. at 1435 (quoting Barnette, 319 U.S. at 637, 63 S.Ct. at 1185).

■■■ The most obvious infringement on First Amendment rights in the context of compelled speech occurs when individuals are forced to make a direct affirmation of belief. See, e.g., Barnette, 319 U.S. at 633, 63 S.Ct. at 1183 ("the compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind"); Wooley, 430 U.S. at 715, 97 S.Ct. at 1435 ("New Hampshire's statute in effect requires that appellees use their private property as a 'mobile billboard' for the State's ideological message"); Pacific Gas & Elec. Co. v. Public Util. Comm'n, 475 U.S. 1, 17–18, 106 S.Ct. 903, 912, 89 L.Ed.2d 1 (1986) ("the [California Public Utilities] Commission's order requires [Pacific Gas Company] to use its property—the billing envelopes—to distribute the message of another."). The IOLTA Rule does not compel the plaintiffs to display, affirm or distribute ideologies or expression allegedly advocated by the IOLTA program or its recipient organizations. Direct compelled speech, therefore, is not an issue in this case.

■■■ Compelled support of an organization engaging in expressive activities may also burden First Amendment rights. In a series of cases, the Supreme Court has examined the First Amendment implications raised by compelled financial support of unions and bar associations which engage in political or ideological activities. See, e.g., Keller v. State Bar of Cal., 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990); Lehnert v. Ferris Faculty Ass'n, —— U.S. ——, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991); Chicago Teachers Union, Local No. 1, AFT, AFL-

CIO v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); Ellis v. Railway Clerks, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); Abood v. Detroit Board of Educ., 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); Railway Clerks v. Allen, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963); Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); Lathrop v. Donohue, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961); Railway Employees Dept. v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). The Court found that compelled financial support of these organizations implicates First Amendment rights when the funds were used to subsidize ideological or political activities.

■■■ In our analysis of the plaintiffs' First Amendment claims, we must first determine whether the IOLTA Rule burdens protected speech by forcing expression through compelled support of organizations espousing ideologies or engaging in political activities. If so, we will then strictly scrutinize the IOLTA program to determine whether the IOLTA Rule serves compelling state interests through means which are narrowly tailored and germane to the state interests. See Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 656, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990); Pacific Gas & Elec. Co., 475 U.S. at 19, 106 S.Ct. at 913; Abood, 431 U.S. at 235, 97 S.Ct. at 1799.

### 1. Is the IOLTA Rule Compulsory?

■■■ The district court concluded that the IOLTA Rule was not compulsory because lawyers could avoid establishing IOLTA accounts by choosing not to hold client funds or by establishing individual client accounts. Washington Legal Found., 795 F.Supp. at 55. On appeal, the plaintiffs argue that the district court erred in not finding the IOLTA Rule compulsory as to them. Interpretation of a state disciplinary rule of professional conduct is a question of law which we review under the de novo standard. In re Dresser Indus., Inc., 972 F.2d 540, 543 (5th Cir.1992); see also Salve Regina College v. Russell, 499

free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the

people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. 225, ——, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190 (1991) (holding that district courts are not entitled to deference on review of determinations of state law). Reviewing a dismissal, we apply the law to the facts alleged in the complaint and taken as true. *AVX Corp.*, 962 F.2d at 115.

The IOLTA Rule obligates lawyers to deposit client funds which they hold for short terms or in minimal amounts into IOLTA accounts. The plaintiffs allege facts which, when taken as true, establish that avoiding the IOLTA Rule has significantly limited Attorney Tuttle's practice of law and negatively affected his livelihood.[12] Attorney Howes alleges that he has had to comply with IOLTA to maintain his practice of law despite his belief that the IOLTA Rule compels him to support politics and ideologies with which he disagrees.

■ Claimants cannot be required by government action to relinquish First Amendment rights as a condition of retaining employment. *Keller*, 496 U.S. at 10, 110 S.Ct. at 2234. As alleged by the plaintiffs, the burden on Tuttle and Howes of avoiding the IOLTA Rule is more than an inconvenience, although it is less extreme than forcing loss of employment. *See Austin*, 494 U.S. at 663, 110 S.Ct. at 1399 (recognizing that "less extreme disincentives than the loss of employment" can force association affecting First Amendment rights). Reviewing the dismissal of their claims, we take the plaintiffs' factual allegations as true and we draw the inference in their favor that they cannot engage in the full practice of law

without holding client funds which would trigger compliance with the IOLTA Rule.[13] Therefore, based on the stated assumptions and inference, the IOLTA Rule is compulsory as to the two plaintiffs who are lawyers for purposes of deciding this case.

■ A different question is presented as to the compulsory effect of the IOLTA Rule on plaintiffs who are clients. Although the IOLTA Rule does not directly regulate clients, its effect is compulsory because lawyers generally deposit appropriate funds from clients into IOLTA accounts without the knowledge or consent of their clients. Therefore, the IOLTA Rule effectively coerces clients' compliance through the practices of their lawyers. Even if clients were informed of the IOLTA Rule and offered a choice, we will assume, again for the limited purposes of reviewing dismissal of this case, that there are circumstances in which the use of IOLTA accounts is necessary for legal representation and therefore, that clients would at times be compelled to allow their funds to be deposited in IOLTA accounts.

### 2. *Does the IOLTA Rule Compel Speech by the Plaintiffs?*

The client-plaintiffs allege that "the collection and use of interest, under color of state law, generated from the IOLTA trust accounts ..., especially for litigation that involves political or ideological causes, and for legislative or other forms of lobbying, deprive [plaintiffs] of [their] right to freedom of speech and association." The lawyer-plain-

---

**12.** We express no opinion concerning whether the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, requires lawyers to use IOLTA accounts as alleged by the plaintiffs. Because the allegation requires a legal conclusion, it is not an allegation of fact and is not taken as true for purposes of reviewing the dismissal of the plaintiffs' suit.

**13.** In a dissent urging a stiffer penalty on a malfeasant lawyer, the following passage was quoted to illustrate the importance of holding clients' funds in the practice of law:

"Like many rules governing the behavior of lawyers, [the rule governing client funds] has its roots in the confidence and trust which clients place in their attorneys. Having sought his advice and relying on his expertise, the client entrusts the lawyer with the transac-

tion—including the handling of the client's funds. Whether it be a real estate closing, the establishment of a trust, the purchase of a business, the investment of funds, the receipt of proceeds of litigation, or any one of a multitude of other situations, it is commonplace that the work of lawyers involves possession of their clients' funds. That possession is sometimes expedient, occasionally simply customary, but usually essential. Whatever the need may be for the lawyer's handling of clients' money, the client permits it because he trusts the lawyer."

*Matter of Driscoll*, 410 Mass. 695, 575 N.E.2d 46, 51–52 (1991) (Greaney, J., dissenting) (quoting *Matter of Wilson*, 81 N.J. 451, 454, 409 A.2d 1153 (1979)).

tiffs allege that forcing them to comply with the IOLTA Rule requires them to choose between serious curtailment of their practice of law or "associating with organizations whose actions offend [their] political and ideological beliefs" depriving them of their right to freedom of speech and association.

The plaintiffs rely on the compulsory union fees and bar association dues cases for support. They argue that they are required to finance IOLTA program recipient organizations in the same way that dissenting union members and bar association members have been compelled to support political and ideological causes through the collection of fees and dues which the Supreme Court has found to be unconstitutional. In *Abood,* 431 U.S. 209, 97 S.Ct. 1782, Detroit school teachers challenged an "agency-shop" clause in their collective-bargaining agreement with the school board claiming that it violated their First Amendment rights.[14] The agency-shop clause required employees who chose not to join the representative union to pay dues to support the union's collective bargaining efforts to avoid allowing non-members to benefit from collective bargaining, as "free-riders", without paying. The Supreme Court found that "[t]o compel employees financially to support their collective-bargaining representative [had] an impact on their First Amendment interests." *Id.* at 222, 97 S.Ct. at 1793. The Court held that unions could not use the dues of dissenters for political or ideological causes that were not germane to the collective-bargaining purpose of the agency-shop requirement. *Id.* at 235–36, 97 S.Ct. at 1799–1800.

14. An "agency-shop" does not require union membership of all employees while a "union-shop" does. The Court has not distinguished, for First Amendment purposes, between compelled union membership and compelled financial support of unions. *Abood,* 431 U.S. at 217, n. 10, 97 S.Ct. at 1791, n. 10; *see also Keller,* 496 U.S. at 7–9, 110 S.Ct. at 2232–34.

15. *See, e.g., Hays County Guardian v. Supple,* 969 F.2d 111, 122–24 (5th Cir.1992) (compulsory student fees used to support university newspaper), *cert. denied,* —— U.S. ——, 113 S.Ct. 1067, 122 L.Ed.2d 371 (1993); *Carroll v. Blinken,* 957 F.2d 991 (2d Cir.) (compulsory student fees used to support NYPIRG, statewide student advocacy organization), *cert. denied,* —— U.S. ——, 113 S.Ct. 300, 121 L.Ed.2d 224 (1992); *United States v.*

In the context of bar association dues, the Court similarly found that compelled dues of members of a unified bar association could not be used to finance activities which were not germane to administrative purposes of the bar association. *Keller,* 496 U.S. at 14, 110 S.Ct. at 2236; *see also Schneider v. Colegio de Abogados de Puerto Rico,* 917 F.2d 620 (1st Cir.1990).

■ The union fees and bar association dues cases do not support the plaintiffs' cause nor do other cases which have considered the First Amendment implications of compelled contribution to organizations.[15] These cases show that compelled speech, through compelled financial support, arises from the dissenters' involuntary association with ideology or political activities. To affect First Amendment rights, there must be a connection between dissenters and the organization so that dissenters reasonably understand that they are supporting the message propagated by recipient organizations. Typically, compelled contribution of money to support political or ideological causes is the root of the evil which offends the First Amendment: "'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical.'" *Abood,* 431 U.S. at 234–35 n. 31, 97 S.Ct. at 1799 n. 31 (quoting I. Brant, James Madison: The Nationalist 354 (1948)).

■ In this case, the plaintiffs' allegations that "[t]he collection of and use of interest, under color of state law, generated

*Frame,* 885 F.2d 1119 (3d Cir.1989) (fee imposed on cattle producers and importers by federal statute used to fund national beef campaign by remitting funds to recipient organizations), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1070 (1990); *Galda v. Rutgers,* 772 F.2d 1060 (3d Cir.1985) (compulsory student fee used to support NJPIRG), *cert. denied,* 475 U.S. 1065, 106 S.Ct. 1375, 89 L.Ed.2d 602 (1986); *Smith v. Regents of the Univ. of Calif.,* 4 Cal.4th 843, 16 Cal.Rptr.2d 181, 844 P.2d 500 (1993) (compulsory student fees used to support a wide range of student organizations and activities); *Cahill v. Public Service Comm'n,* 76 N.Y.2d 102, 556 N.Y.S.2d 840, 556 N.E.2d 133 (1990) (utilities authorized by N.Y. Public Service Commission to pass along to ratepayers cost of charitable contributions).

by funds in IOLTA trust accounts" violate their rights to freedom of speech and association do not state a claim of compelled financial support. The interest generated by funds deposited in IOLTA accounts is not the clients' money. The process by which the IOLTA program collects and uses the accrued interest does not affect the plaintiffs' funds held in IOLTA accounts nor does it require any other expenditures or efforts by the plaintiffs.[16] Put simply, the plaintiffs have not been compelled by the IOLTA Rule to contribute their money to the IOLTA program. Rather, the IOLTA program recipient organizations benefit from an anomaly created by the practicalities of accounting, banking practices, and the ethical obligation of lawyers. The interest earned on IOLTA accounts belongs to no one, but has been assigned, by the Massachusetts Supreme Judicial Court, to be used by the IOLTA program. Therefore, the collection and use of the interest by the IOLTA program does not constitute financial support by the plaintiffs, as they claim. If the plaintiffs believe that the IOLTA program is not operated in accord with its stated purpose or if they remain dissatisfied with the assigned recipients of IOLTA funds, they may address their complaints to the IOLTA Committee or the Massachusetts Supreme Judicial Court.

The plaintiffs have not alleged and there are no other facts or circumstances which establish that they have been compelled to associate with or support the IOLTA program in any other manner. They have not been compelled by the IOLTA Rule to join, affirm, support or subsidize ideological expression of IOLTA recipient organizations in any way.[17] Because the plaintiffs have not adequately alleged that the IOLTA Rule compels a connection between them and the IOLTA recipient organizations, we find that the IOLTA Rule does not burden the plaintiffs' First Amendment rights. Having found no impact on the plaintiffs' First Amendment rights caused by the IOLTA Rule, we need not consider whether the IOLTA program serves a compelling state interest. The district court's order dismissing the plaintiffs' claims is

*Affirmed.*

16. We note that the plaintiff-lawyers are required by the IOLTA Rule to set up IOLTA accounts in banks and deposit appropriate client funds therein. Because a comparable effort would be necessary to set up non-interest bearing accounts for the deposit of client funds, we find it inconsequential for First Amendment analysis.

17. Although the plaintiffs have alleged deprivation of their right to freedom of association, we have found no factual allegations to support their claim. The IOLTA Rule does not require that clients or lawyers join any organization. The plaintiffs have not alleged that the organizations which ultimately receive IOLTA funding automatically include them as members or otherwise link them to the organizations without their consent. *C.f. Carroll*, 957 F.2d at 1003 (holding that SUNY Albany's distribution of student fees to NYPIRG which automatically made all students members, impermissibly forced association in violation of the First Amendment).

## CANON 9

**A Lawyer Should Avoid Even the Appearance
of Professional Impropriety**

### DISCIPLINARY RULES

#### DR 9–101. Avoiding Even the Appearance of Impropriety

(A) A lawyer shall not accept private employment in a matter upon the merits of which he has acted in a judicial capacity.

(B) A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

(C) A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official.

#### DR 9–102. Preserving Identity of Funds and Property of a Client

(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

(3) Maintain complete records of the handling, maintenance and disposition of all funds, securities and other properties of a client coming into the possession of the lawyer from the time of receipt to the time of final distribution; preserve such records for a period of ten years after final distribution of such funds, securities or other properties; and render appropriate accounts to the client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

(C) Each lawyer who holds client funds shall deposit such funds, as appropriate, in one of two types of interest-bearing accounts: either a pooled account ("IOLTA account") for all client funds which in the judgment of the lawyer are nominal in amount, or are to be held for a short period of time, or an individual account with the interest payable as directed by the client for all other client funds; provided, however, that an account in the name of an attorney in a lending bank used exclusively for depositing and disbursing funds in connection with that bank's loan transactions ("conveyancing accounts") shall not be required but is permitted to be established as an IOLTA account. All IOLTA accounts shall be established in compliance with the following provisions:

(1) The IOLTA account shall be established with any bank, savings and loan association, or credit union authorized by Federal or State law to do business in Massachusetts and insured by the Federal Deposit Insurance Corporation or similar State insurance programs for State-chartered institutions. Funds in the IOLTA account shall be subject to withdrawal upon request and without delay.

(2) Lawyers or law firms creating and maintaining an IOLTA account shall direct the depository institution:

(a) To remit interest or dividends, net of any service charges or fees, on the average monthly balance in the account, or as otherwise computed in accordance with an institution's standard accounting practice, at least quarterly, to a tax-exempt recipient disburser entity (hereinafter "charitable entity") selected by the lawyer or law firm from among those charitable entities designated by the Supreme Judicial Court, for use in (1) improving the administration of justice or (2) delivering civil legal services to those who cannot afford them.[1]

(b) To transmit with each remittance to the charitable entity a statement showing the name of the lawyer or law firm which deposited the funds; and

(c) At the same time to transmit to the depositing lawyer or law firm, with a copy to the IOLTA Committee or its designee, a report showing the amount paid to the charitable entity, the rate of interest applied, and the method by which the interest was computed.

(3) Lawyers shall certify their compliance with this rule as required by Rule 4:02, subsection (2).

(4) This court shall appoint members of a permanent IOLTA Committee to fixed terms on a staggered basis. The representatives appointed to the Committee shall oversee the operation of a comprehensive IOLTA program, including:

(a) the education of lawyers as to their obligation to create and maintain IOLTA accounts under DR 9–102(C);

(b) the encouragement of the banking community and the public to support the IOLTA program;

(c) the obtaining of tax rulings and other administrative approval for a comprehensive IOLTA program as appropriate;

(d) the preparation of such guidelines and rules,* subject to court approval, as may be deemed necessary or advisable for the operation of a comprehensive IOLTA program;

(e) establishment of standards for reserve accounts by the recipient charitable entities for the deposit of IOLTA funds which the charitable entity intends to preserve for future use; and

(f) reporting to the court in such manner as the court may direct.

* Pub. Note: The IOLTA Guidelines are set forth following this Disciplinary Rule.

(5) Any charitable entity designated by the Supreme Judicial Court hereunder may engage in attorney recruitment efforts. All charitable entities, other than Massachusetts Legal Assistance Corporation, shall pay to Massachusetts Legal Assistance Corporation not less than fifty percent (50%) of the IOLTA funds received less expenses properly allocable to such share. Massachusetts Legal Assistance Corporation will retain for its use in the furthering of its corporate purpose all of the IOLTA funds received by it, by direct solicitation and from other charitable entities.

(6) Each charitable entity shall submit an annual report to the court describing its IOLTA activities for the year and providing a statement of the source and application of IOLTA funds received pursuant to this rule.

1. The Boston Bar Foundation, the Massachusetts Bar Foundation and Massachusetts Legal Assistance Corporation are hereby designated as "charitable entities," as defined in DR 9–102(C)(2)(a).

Amended May 23, 1985, effective Sept. 1, 1985; amended effective March 10, 1986; amended Sept. 26, 1989, effective Jan. 1, 1990; amended effective Feb. 1, 1991.

Amendment of Mass. S. J. C. Rule 3:07, Canon 9, DR 9-102(C) by Order 92-18, effective January 1, 1993:

ORDERED: That Chapter Three of the Rules of the Supreme Judicial Court is hereby amended as follows:

Rule 3:07, DR 9-102(C):
By striking out subsections (2), (3), (4), (5) and (6) and inserting in lieu thereof the new subsections attached hereto.

(2) Lawyers or law firms creating and maintaining an IOLTA account shall direct the depository institution:
(a) To remit interest or dividends, net of any service charges or fees, on the average monthly balance in the account, or as otherwise computed in accordance with an institution's standard accounting practice, at least quarterly, to the IOLTA Committee;
(b) To transmit with each remittance to the IOLTA Committee a statement showing the name of the lawyer who or law firm which deposited the funds; and
(c) At the same time to transmit to the depositing lawyer or law firm a report showing the amount paid, the rate of interest applied, and the method by which the interest was computed.
(3) Lawyers shall certify their compliance with this rule as required by Rule 4:02, subsection (2).
(4) This court shall appoint members of a permanent IOLTA Committee to fixed terms on a staggered basis. The representatives appointed to the committee shall oversee the operation of a comprehensive IOLTA program, including:
(a) the receipt of all IOLTA funds and their disbursement, net of actual expenses, to the designated charitable entities, as follows: sixty-seven percent (67%) to the Massachusetts Legal Assistance Corporation and the remaining thirty-three percent (33%) to other designated charitable entities in such proportions as the Supreme Judicial Court may order;
(b) the education of lawyers as to their obligation to create and maintain IOLTA accounts under DR 9-102(C);
(c) the encouragement of the banking community and the public to support the IOLTA program;

(d) the obtaining of tax rulings and other administrative approval for a comprehensive IOLTA program as appropriate;

(e) the preparation of such guidelines and rules, subject to court approval, as may be deemed necessary or advisable for the operation of a comprehensive IOLTA program;

(f) establishment of standards for reserve accounts by the recipient charitable entities for the deposit of IOLTA funds which the charitable entity intends to preserve for future use; and

(g) reporting to the court in such manner as the court may direct.

(5) The Massachusetts Legal Assistance Corporation and other designated charitable entities shall receive IOLTA funds from the IOLTA Committee and distribute such funds for approved purposes. The Massachusetts Legal Assistance Corporation may use IOLTA funds to further its corporate purpose and other designated charitable entitles [sic] may use IOLTA funds either for (1) improving the administration of justice or (2) delivering civil legal services to those who cannot afford them.

(6) The Massachusetts Legal Assistance Corporation and other designated charitable entities shall submit an annual report to the court describing their IOLTA activities for the year and providing a statement of the application of IOLTA funds received pursuant to this rule.