# United States Court of Appeals
## For the First Circuit

No. 22-1048

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING
CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE
EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY
(PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS
AUTHORITY,

Debtors,

_____

COOPERATIVA DE AHORRO Y CREDITO ABRAHAM ROSA; COOPERATIVA DE
AHORRO Y CREDITO DE CIALES; COOPERATIVA DE AHORRO Y CREDITO DE
JUANA DIAZ; COOPERATIVA DE AHORRO Y CREDITO DE RINCON;
COOPERATIVA DE AHORRO Y CREDITO DE VEGA ALTA; COOPERATIVA DE
AHORRO Y CREDITO DR. MANUEL ZENO GANDIA,

Plaintiffs, Appellants,

COOPERATIVA DE AHORRO Y CREDITO DE LARES Y REGION CENTRAL,

Plaintiff,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS
REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING
CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE

EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; CORPORACIÓN PÚBLICA PARA LA SUPERVISIÓN Y SEGURO DE COOPERATIVAS DE PUERTO RICO; GOVERNMENT DEVELOPMENT BANK OF PUERTO RICO; GDB DEBT RECOVERY AUTHORITY; JORGE L. PADILLA, Nominal Defendant; MATTHEW KARP, Nominal Defendant; DAVID PAUKER, Nominal Defendant; GDB PUBLIC ENTITY TRUST; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; JOSE B. CARRION, III; ANDREW G. BIGGS; ARTHUR J. GONZALEZ; CARLOS M. GARCIA; JOSE R. GONZALEZ; ANA J. MATOSANTOS; DAVID A. SKEEL, JR.; ELI DIAZ ATIENZA; SECURITIES FIRMS A-Z; LAW FIRMS AND COUNSEL; ACCOUNTING AND/OR AUDITING FIRMS; INSURANCE COMPANIES A-Z,

Defendants, Appellees,

CHRISTIAN SOBRINO,

Defendant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

———————————

Before

Kayatta, Howard, and Thompson,
Circuit Judges.

———————————

Guillermo J. Ramos-Luiña for appellants.

Arthur Steinberg, with whom Scott I. Davidson, King & Spalding LLP, Ileana M. Oliver-Falero, Charles E. Vilaró-Valderrábano, and

_____

* Of the Southern District of New York, sitting by designation.

Cancio Covas & Santiago, LLP were on brief, for appellees the GDB Debt Recovery Authority, Jorge L. Padilla, Matthew Karp, and David Pauker.

Juan Carlos Deliz, with whom DBPR Legal, LLC was on brief, for appellee Corporación Pública para la Supervision y Seguro de Cooperativas de Puerto Rico.

John E. Roberts, with whom Timothy W. Mungovan, Adam L. Deming, Martin J. Bienenstock, Mark D. Harris, Jonathan E. Richman, Julia D. Alonzo, Shiloh A. Rainwater, and Proskauer Rose LLP were on brief, for appellee the Financial Oversight and Management Board for Puerto Rico, for itself and as representative of the debtors, and the Board's individual members.

Luis C. Marini-Biaggi, Carolina Velaz Rivero, Ignacio J. Labarca-Morales, and Marini Pietrantoni Muñiz LLC for appellees the Puerto Rico Fiscal Agency and Financial Advisory Authority and the Government Development Bank of Puerto Rico.

November 23, 2022

**THOMPSON, <u>Circuit Judge</u>.** In this adversary proceeding,[1] six Credit Unions[2] claim the Commonwealth of Puerto Rico and several of its agencies and instrumentalities[3] induced and forced them to invest in worthless government-issued securities. According to the Credit Unions, the defendants knew -- but did not disclose -- that these would be losing investments given the precarious and dire financial situation in which Puerto Rico found itself at the time. As part of the broader proceedings underway to restructure the Commonwealth's debts pursuant to Title III of

---

[1] "[A]n adversary proceeding is a subsidiary lawsuit within the larger framework of a bankruptcy case." <u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>, 872 F.3d 57, 63 (1st Cir. 2017) (alteration in original) (quoting <u>Kowal</u> v. <u>Malkemus</u> (<u>In re Thompson</u>), 965 F.2d 1136, 1140 (1st Cir. 1992)); <u>see also</u> Fed. R. Bankr. P. 7001 (which 48 U.S.C. § 2170 says shall apply to PROMESA cases).

[2] The plaintiffs include Cooperativa de Ahorro y Crédito Abraham Rosa, Cooperativa de Ahorro y Crédito de Ciales, Cooperativa de Ahorro y Crédito de Juana Díaz, Cooperativa de Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito Vega Alta, and Cooperativa de Ahorro y Crédito Dr. Manual Zeno Gandia.

[3] The agencies and instrumentalities named as defendants include the Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico ("COSSEC"), the Government Development Bank ("GDB"), the GDB Debt Recovery Authority and the three members of its Board of Trustees, the GDB Public Entity Trust, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("FAFAA" or "AAFAF"), the Puerto Rico Sales Tax Financial Corporation ("COFINA"), the Puerto Rico Highways and Transportation Authority ("HTA"), the Employees' Retirement System of the government of the Commonwealth of Puerto Rico ("ERS"), the Puerto Rico Electric Power Authority ("PREPA"), the Public Buildings Authority ("PBA"), the Financial Oversight and Management Board ("FOMB") and its seven members (plus one ex-officio member), as well as unidentified securities firms, law firms and attorneys, accounting firms, auditing firms, and insurance companies.

- 4 -

the Puerto Rico Oversight, Management, and Stability Act ("PROMESA"),[4] the Credit Unions filed an adversary complaint alleging the defendants, through conversations, meetings, and presentations held between 2009 and 2015, as well as through written policy guidance issued within the same timeframe, induced them to purchase government bonds by both misrepresenting and withholding information about the risks of the investment. The district court dismissed the Credit Unions' claims, and, for the reasons we explain below, we affirm.

**LAYING THE GROUNDWORK**

We begin, as we generally do, with a summary of the facts and procedural history of the case. When we review the grant of a motion to dismiss, "[a]ll facts are taken from the complaint and accepted as true . . . and we disregard any conclusory allegations." Ponsa-Rabell v. Santander Sec. LLC, 35 F.4th 26, 30 n.2 (1st Cir. 2022) (citing O'Brien v. Deutsche Bank Nat'l Tr. Co., 948 F.3d 31, 35 (1st Cir. 2020)). We may also consider documents attached to the complaint or incorporated by reference therein. Id. (citing O'Brien, 948 F.3d at 35). We start with a

---

[4] Detailed descriptions of PROMESA, its genesis, and its structure abound in our case law. See, e.g., In re Fin. Oversight & Mgmt. Bd. for P.R., 32 F.4th 67, 73-75 (1st Cir. 2022); Centro de Periodismo Investigativo, Inc. v. Fin. Oversight & Mgmt. Bd. for P.R., 35 F.4th 1, 5 (1st Cir. 2022). This opinion will presume the reader's general familiarity with PROMESA's raison d'être.

brief introduction of the defendants that the Credit Unions (also referred to as the "cooperatives") allege and argue were actively involved in the fraudulent scheme that forms the basis of their claims.

The Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico ("COSSEC") is the agency through which the Commonwealth of Puerto Rico establishes and implements regulations and supervision over financial depository institutions, including the plaintiff Credit Unions. COSSEC generates what are known as "circular letters" several times per year that address issues such as "[r]egulatory reporting requirements," "[i]ncrease[s] in the allowed amount of investments in Puerto Rico bonds," and "[r]equired insurance coverages." The Credit Unions must comply with the circular letters, which are enforced by COSSEC, or face potential adverse consequences such as an administrative fine, removal of officers or directors, or placement in receivership. The Credit Unions rely on information provided by COSSEC about the Commonwealth's financial situation.

The Government Development Bank ("GDB") is a fiscal agent of the Commonwealth that "designed, oversaw, controlled and was in charge of all bond and debt issued by the Commonwealth and its instrumentalities, including the issuance of the Puerto Rico Debt Securities that were offered and sold to [the Credit Unions]." The GDB had "specific knowledge" of the details of the

- 6 -

Commonwealth's financial situation from 2009 onwards. The GDB Debt Recovery Authority is a separate entity created by a 2017 statute for the purpose of implementing a debt restructuring plan for the GDB's debts.

According to the Credit Unions as alleged in their complaint, the GDB and other governmental agencies "adopted regulatory measures over [the Credit Unions] to implement the taking of their cash and liquid funds" all the while knowing the likely "adverse effects" to the Credit Unions. These measures included using COSSEC to place "excessive amounts of unsustainable, materially diminished and value impaired governmental instruments in [the Credit Unions'] investment portfolios." From 2009 to 2015, through meetings and conversations between agency officials,

> [t]he Commonwealth, the GDB and COSSEC abused and misused the governmental regulatory power over credit unions, adopting a regulatory policy of steering credit unions' liquid resources towards Puerto Rico Debt Instruments which the Commonwealth and the GDB knew were unsafe, risky, unsustainable and that lacked adequate sources of repayment. This regulatory policy was implemented through the issuance of circular letters together with coercive and selective examinations and the threat of retaliatory legislative initiatives. As a result of this scheme, the Commonwealth and the GDB took material portions of [the Credit Unions'] cash and liquid assets without providing adequate compensation for them.

The Credit Unions attached two of these circular letters as exhibits to their pleading. In Circular Letter 09-03, issued in

2009, COSSEC "authorized the purchase of . . . bonds currently offered by the Commonwealth of Puerto Rico through the [GDB]." The letter stated that "[t]he cooperatives that participate in the purchase of these investment products may benefit from the advantages that these bonds offer," including as payment history because the bonds are "backed by the Government, which guarantees 100% of interest and principal payments" and as collateral because the "bonds are excellent guarantees, which allows investors to apply for loans against their investment." The letter provided that "cooperatives may purchase" the bonds, "as long as they ensure that at the time of purchase" the bonds are rated within a certain range of quality and creditworthiness classifications.[5] The letter reminded the cooperatives that acquisition of the bonds must be in compliance with the governing regulations about limits of investments but provided that COSSEC will not consider a drop in classification after the date of acquisition or purchase of the investment to be a violation of the governing regulations. Should

---

[5] "Municipal bond ratings determine the amount of investment risk and interest cost on bonds used for financing government projects. These ratings, much like a credit risk evaluation, assess the following factors in determining the degree of interest and risk:
- Current state of the economy
- Debt structure
- Financial condition
- Management practices"
Municipal Bond Ratings, Bondview, https://www.bondview.com/municipal-bond-ratings/summary-rating, last visited November 21, 2022.

the bonds' classification drop after purchase, the letter authorized the Credit Unions to "perform an analysis to determine the course of action to take in the best interest of the institution." The Credit Unions allege that the "guarantee[d] 100% of interest and principal payments" statement was misleading because members of COSSEC's board of directors knew the government could not, given Puerto Rico's financial posture, honor repayment to the Credit Unions.

In the other Circular Letter attached to the complaint -- 2012-02 -- issued in 2012, COSSEC acknowledged Puerto Rico's economic recession and explained that an "indirect effect of increasing the levels of default for financial institutions" leads to financial institutions' hesitancy to grant credit, which leads to a higher proportion of "liquid resources" and an excess of regulatory liquidity. Therefore, COSSEC was authorizing a 5% increase (from 25% to 30%) in the total percentage of "liquid resources in negotiable instruments" the cooperatives "may invest in additional instruments."

The Credit Unions allege that, after COSSEC issued Circular Letter 2012-02, the defendants "obtained around 156 million dollars from [them]" and that, by August 2017, the Credit Unions had "heavily invested in securities issued by the Puerto Rico government and its instrumentalities." The Credit Unions contend that "[t]he taking of the cash, capital and liquid reserves

of the [Credit Unions] through the improper use of COSSEC's regulatory authority was undertaken with knowledge by the GDB [and other agencies] of the risks and difficulties surrounding Puerto Rico's public finances" and that the GDB knowingly exposed the Credit Unions to "higher concentrations of risk."

In addition, the Credit Unions aver that both the GDB and COSSEC were derelict in their duties and failed to help devise strategies to stabilize Puerto Rico's financial system in 2015 when the financial crisis was on the doorstep of the Commonwealth or when the Credit Unions were actively involved in proposing ways to mitigate the failure of the financial system and the restructure of it. The Credit Unions further assert that Circular Letter 2012-02 "allowed the government to take an increased amount of [Credit Union] moneys in exchange for instruments of substantially diminished value that had the consequence of a higher concentration of risk in unsound Puerto Rico Debt Securities, which was a harmful investment strategy for the [Credit Unions]." The Credit Unions' professed damages include monetary losses in income, principal, capital, and liquidity, market value losses for the debt securities they continue to hold, reputational losses, and business losses.[6]

---

[6] In spite of being defrauded, the Credit Unions allege that they have nonetheless shown growth and remained stable financial institutions throughout Puerto Rico's financial crunch.

In March 2018, the Credit Unions initiated this adversary proceeding against the Commonwealth of Puerto Rico, COSSEC, the GDB, the GDB Debt Recovery Authority, the members of the GDB Debt Recovery Authority's Board of Trustees, the FOMB, the individual members of the FOMB, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("FAFAA" or "AAFAF"), and five of the Title III co-defendant debtors: the Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Employees Retirement System ("ERS"), the Highways and Transportation Authority ("HTA"), the Public Buildings Authority ("PBA"), and the Electric Power Authority ("PREPA"). The Credit Unions requested an exception from discharge of their debts alleged in the Title III proceeding, advancing two primary theories of recovery. First, pursuant to 11 U.S.C. §§ 105 and 944, on the basis that the defendants' conduct, which the Credit Unions alleged was fraudulent, should disqualify them from dischargeability of the defendants' debts related to the Credit Unions' claims. Second, citing PROMESA, the Credit Unions requested a declaratory judgment and exception to discharge based on the defendants' allegedly fraudulent conduct. The Credit Unions also listed some specific common law claims such as breach of contract, breach of warranties, and promissory estoppel, as well as federal and Puerto Rico statutory claims such as violations of

statutes related to securities, negligence, fiduciary obligation, and fraud.[7]

In response, the defendants filed motions to dismiss all the counts for failure to state claims upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the fraud-based claims for failure to meet the particularity requirement of Fed. R. Civ. P. 9(b), the Puerto Rico law-based claims under Fed. R. Civ. P. 12(b)(1) as time-barred by statutes of limitations, and claims alleged against some of the defendants also under Rule 12(b)(1) on the basis that the claims were either not yet ripe or moot. After several skirmishes over the Credit Unions' efforts to amend their complaint, the district court ultimately allowed a second amended complaint ("SAC") (the operative complaint in this appeal), which beefed up the factual allegations to support the extant claims.[8] The SAC sets forth seven counts against the various

---

[7] Shortly after the Credit Unions filed their initial complaint, the district court allowed the Official Committee of Unsecured Creditors to intervene.

[8] The Credit Unions' motion to amend their pleading to file a second amended complaint lingered awhile because the parties litigated a second case the Credit Unions had filed against COSSEC. As summarized by the district court in its decision to allow the Credit Unions to file the second amended complaint, this second case sought "a declaration that COSSEC . . . was insolvent and an injunction requiring the Commonwealth to lend money to COSSEC." The district court denied the injunction, see Docket Entry 24 in Case No. 19-AP-389, and although the Credit Unions filed a notice of appeal, they subsequently voluntarily dismissed it.

defendants, specifically (and as relevant to this appeal) the SAC contends that:

- COFINA, HTA, ERS, and PREPA (through the GDB as each agency's "fiscal agent") benefited from the fraudulent actions and omissions such that the plaintiffs' claims in the Title III cases should be excepted from discharge pursuant to 11 U.S.C. §§ 105 and 944 (count 1);

- plaintiffs should be designated as a separate class for the Title III case and granted a declaratory judgment and exception to discharge pursuant to the purposes of PROMESA (count 2);

- the Commonwealth, through the GDB and COSSEC and the circular letters, engaged in fraudulent actions and omissions and are liable under Puerto Rico's Act Against Organized Crime (count 3);

- (labeled "breach of contractual obligations") the GDB, COSSEC, and the Commonwealth's fraudulent misrepresentations and omissions damaged the Credit Unions, or in the alternative, these entities caused harm to the Credit Unions through gross negligence (count 4);

- (labeled "torts claim") COSSEC and its directors engaged in fraudulent acts for which they are separately and civilly

liable under the general Puerto Rico torts statute (count 5); and

- "[t]he illegal appropriation of the [Credit Unions'] moneys . . . by the Commonwealth, through the use of its regulatory powers, to fund an insolvent government, violates the takings clause of the Constitution of Puerto Rico, Article II § 9, and the Constitution of the United States, Amendment V" (count 6).[9]

Again, the defendants filed motions to dismiss the entire SAC for the same reasons they asserted in their initial motions to dismiss the first complaint.[10] For reasons we'll explore momentarily, the district court granted the motions, dismissing the entire SAC against all the defendants, and, on January 4, 2022, entered final judgment. The Credit Unions timely appealed; their subsequent briefing challenges only the dismissal of counts 1-6 as against the Commonwealth, COSSEC, the GDB, and the GDB Debt Recovery Authority.

---

[9] The seventh count alleged unjust enrichment -- the dismissal of this claim is not pressed on appeal.

[10] The FOMB filed its motion to dismiss on behalf of itself, the Commonwealth, and the five debtor-defendants (COFINA, PREPA, HTA, PBA, ERS). COSSEC, AAFAF, and the Official Committee of Unsecured Creditors joined the FOMB's motion. The GDB and GDB Debt Recovery Authority each filed its own motion to dismiss.

## A SET OF LENSES FOR OUR REVIEW

We review the district court's dismissal of the Credit Unions' claims pursuant to Rule 12(b)(1) and 12(b)(6) de novo. Ponsa-Rabell, 35 F.4th at 32; Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 622 (1st Cir. 2019). "We may affirm the dismissal on any basis available in the record." Ponsa-Rabell, 35 F.4th at 32 (cleaned up) (quoting Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 30 (1st Cir. 2020)). "To survive a [12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). We need to decide "whether all the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011). "No single allegation in a complaint need lead to the conclusion of some necessary element, provided that, in sum, the allegations of the complaint make the claim as a whole at least plausible." Falmouth Sch. Dep't v. Doe ex rel. Doe, 44 F.4th 23, 47 (1st Cir. 2022) (cleaned up) (quoting Ocasio-Hernández, 640 F.3d at 14-15).

Because several of the Credit Unions' claims are based on the defendants' allegedly fraudulent conduct, our review includes a deeper scrutiny of the plaintiffs' allegations. See

- 15 -

Katz v. Belveron Real Est. Partners, LLC, 28 F.4th 300, 308 (1st Cir. 2022) ("[H]eightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims effectively charge fraud." (quoting Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 49 (1st Cir. 2020))). Pursuant to Rule 9(b), the plaintiffs "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The pleader of a fraud claim "is expected to specify the who, what, where, and when of the allegedly false or fraudulent representation." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004) (citing Powers v. Bos. Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991)). Moreover, where, as here, a plaintiff pleads in part fraud by omission in a securities-related fraud case, we've said that "a plaintiff must first identify a statement made by defendants, show how the omission rendered that statement misleading, and finally establish that there was a duty to disclose the omitted information." Ponsa-Rabell, 35 F.4th at 34.

## WORKING THROUGH THE ISSUES

The Credit Unions challenge several portions, though not all, of the district court's comprehensive decision granting the defendants' motions to dismiss, including, as against the Commonwealth, the GDB, and COSSEC, the dismissal of all the fraud-based claims for failure to meet the Rule 9(b) heightened pleading

- 16 -

standard (counts 1-5), the dismissal of the Puerto Rico law-based claims (counts 4 and 5) as time-barred, and the dismissal of the takings claim as not plausibly pled.[11]  We will supply additional factual allegations as needed to provide the full context of each issue as we work through the Credit Unions' arguments.

### Allegations of Fraud

On appeal, the Credit Unions do not dispute that their first five counts sound in fraud; before us they focus on arguing that they have plausibly alleged fraudulent conduct on the part of the Commonwealth, COSSEC, and the GDB with sufficient particularity to satisfy Rule 9(b) and to survive the defendants' 12(b)(6) motion to dismiss.[12]  We disagree and explain why.

We proceed with our de novo review of the allegations upon which the Credit Unions focus in light of the general elements

---

[11] In response, the FOMB again writes on behalf of the Commonwealth and the five debtor-defendants, and COSSEC and AAFAF filed a joint brief (though the Credit Unions do not challenge the district court's dismissal of the SAC as against the debtor-defendants or AAFAF).  The GDB and the GDB Debt Recovery Authority each filed their own responsive brief.

[12] The Credit Unions spill quite a bit of ink in their opening brief and reply brief arguing that the district court misapplied both Rules 12(b)(6) and 9(b) by failing to take their well pled allegations as true, failing to draw reasonable inferences in their favor, and holding them to an "unattainable" and "excessively high pleadings standard" for the claims sounding in fraud.  After reviewing the district court's decision granting the motions to dismiss, we disagree.  The district court accurately described and applied the heightened pleading standard for claims based on fraudulent conduct and, after taking a fresh look, for the reasons explained herein, we arrive at the same conclusions drawn by the

of a Puerto Rico fraud claim.[13]  To plausibly allege fraud, the plaintiffs must provide sufficiently specific factual allegations regarding four elements:  "(1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud."  P.R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 66 (1st Cir. 2008) (citing Microsoft Corp. v. Comput. Warehouse, 83 F. Supp. 2d 256, 262 (D.P.R. 2000)), (abrogated on other grounds as recognized in Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56 (1st Cir. 2011)); see also P.R. Laws Ann. Tit. 31, § 3408 (governing claims for "deceit" or fraud in the inducement -- "[t]here is deceit when by words or insidious

district court with respect to the lack of specificity with which the Credit Unions have alleged fraudulent conduct.

In a separately enumerated issue in their brief, the Credit Unions say the district court also erred by applying the wrong "judicial scrutiny standard" in light of the Credit Unions' allegations of government misconduct and ignoring the duty (though without identifying whose duty) to fulfill PROMESA's mandate of promoting governmental transparency.  As best we can tell, the Credit Unions are arguing that the dismissal of this adversary proceeding is unfair because it does not allow them to reach the discovery phase of this litigation so that they can uncover the details not currently within their access and control.  Again, as we discuss herein, the Credit Unions did not meet the heightened pleading standard.  Moreover, the plaintiffs have not persuaded us that they are entitled either to a pass on this standard or to a different standard because they are alleging misconduct perpetrated by the government.

[13] In the SAC, the Credit Unions did not allege fraudulent conduct pursuant to any specific federal or Commonwealth securities laws.

machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made").

This court "strictly applie[s] Rule 9(b) . . . in the securities context," holding that the particularity with which plaintiffs must plead "supporting facts applies 'even when the fraud relates to matters peculiarly within the knowledge of the opposing party.'" New Eng. Data Servs., Inc. v. Becher, 829 F.2d 286, 288 (1st Cir. 1987) (quoting Wayne Inv., Inc. v. Gulf Oil Corp., 739 F.2d 11, 14 (1st Cir. 1984)) (both cases holding general allegations made "based on information and belief" were insufficiently specific); see also Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999). Unlike the plaintiffs in Becher and Wayne Investment, the Credit Unions do provide some factual allegations beyond "based-on-information-and-belief" assertions. However, after carefully scrutinizing the SAC back to front, we believe that the plaintiffs stumble at plausibly pleading even the first element of fraud -- false representations by the defendants.

Combing through the SAC, we see that it primarily outlines a broad and vague fraudulent scheme involving (a) COSSEC's issuance of the two circular letters attached to the SAC and summarized above, (b) meetings and conversations between COSSEC, the GDB, and the Commonwealth, and (c) a presentation by COSSEC. Each encounter involved spreading information that the defendants

- 19 -

allegedly knew to be false at that time, resulting in the Credit Unions' losing investments in the Puerto Rico debt securities. But the allegations here flunk the plausibility test because the SAC does not come close to providing the required level of particularity to satisfy Rule 9(b).

For example, the Credit Unions repeatedly mention "meetings and conversations between officials of the GDB, the governor's office and COSSEC['s chairman and executive president]" and between COSSEC officials in preparation for and at COSSEC's Board of Directors' meetings prior to issuing Circular Letter 09-03. In other words, the allegations are about communication between agency officials. But importantly, the SAC does not identify when these encounters took place or when and how they led to misrepresentations made directly to one or more of the Credit Unions. For example, although the Credit Unions assert in their brief that the SAC "[e]xplains how COSSEC's Executive President pressured Plaintiffs to 'cooperate' with the Government's financial needs," the part of the SAC to which they cite in support alleges only that the government misused its regulatory authority through meetings and conversations between COSSEC's Chairman, COSSEC's Executive President, and (unidentified) officials at the GDB and governor's office. The SAC does not allege a conversation or meeting with officials from the Credit Unions.

- 20 -

Another particularity deficiency is found in the allegation that "COSSEC's Board of Directors and COSSEC's Executive President . . . 'warned' [the Credit Unions] that in the absence of said 'cooperation' it would be necessary to reevaluate the tax-exempt status of Cooperatives." This purported threat is missing an anchor to an alleged time and place; who issued the threat to whom and when? The Credit Unions also allege that COSSEC "summoned the cooperatives to its headquarters" shortly after the 2009 Circular Letter issued and "sponsored a presentation by the GDB to the[m] about the purported virtues of the Puerto Rico bonds," and that this presentation was a key part of its scheme "to obtain funding from the Cooperatives for the government's unsustainable spending while knowing that the Commonwealth did not have the financial means and capability of honoring the bonds in case of default." But again, we see no details about particular statements made or information provided or withheld about the bonds during this presentation. Other allegations in the SAC describe how some defendants allegedly forced officials in other defendant agencies or instrumentalities to take actions but provide no specifics about how, when, what actions, or which plaintiffs were affected by this pressure.[14]

---

[14] A quick aside about the two circular letters highlighted as playing a starring role in the defendants' alleged scheme to defraud. False, say the Credit Unions, are the statements in Circular Letter 09-03 about the purported advantages of the

We also examine the Credit Unions' allegations that the defendants knew the bonds would decline in value at the time the bonds were proposed in the circular letters and subsequently issued to the plaintiffs because, as the leaders of the Commonwealth's financial policy, the Commonwealth, the GDB, and COSSEC had to have known Puerto Rico's "financial situation." Therefore (the way the plaintiffs tell it in the SAC), the defendants knew the bonds were worthless and admitted as much when COSSEC wrote in Circular Letter 09-03 that it would not consider any future drop in the securities' quality and creditworthiness classifications as violations of the regulations governing the Credit Unions' investments. But (and as the district court noted), these

_____

authorized bonds (government backing guaranteeing "100% of interest and principal payments" and the bonds serving as "excellent collateral"). We read the Credit Unions' allegations about the allegedly knowing misrepresentations in these two letters "in light" of the letters' full text, see Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000), keeping in mind that these documents can "trump the complaint's allegations if a conflict exists" between them, Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 n.3 (1st Cir. 2012). The actual language of the letter can be read to contradict the Credit Unions' assertions: The letter plainly states (emphasis ours) that "these investment products may benefit from the advantages that these bonds offer" -- there is no guarantee these benefits will come to fruition. As such, this plain language would seem to trump the allegations about the deliberately and knowingly misleading statements in the letter and we, accordingly, do not credit the spin in the Credit Unions' allegations about the purported guarantee of the advantages of investing in the bonds. See id. at 57. Even if there was no conflict in the language of the SAC as compared to the letters, the Credit Unions failed to adequately plead knowledge of the falsity of any allegedly false statements, as we next explain.

allegations about what the defendants must have known by virtue of their roles governing the Commonwealth's fiscal policy are too broad and speculative. See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009) ("The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that [the] defendant knew that a statement was materially false or misleading." (quoting Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992) (Breyer, J.) (citations omitted), superseded by statute on other grounds) (emphasis in original)). The plaintiffs do not challenge the Title III court's explanation that a particular pleading of knowledge was required, but instead contend that they pled the defendants had "knowledge of th[e] falsity" of their representations. Without any specific details to demonstrate the defendants' particular knowledge about the status of the bonds, the implication about the connection between the defendants' identities and what they knew and when requires too broad an inferential leap. See id.; see also Wayne Inv., Inc., 739 F.2d at 14 (speculative allegations about fraud do not meet the strictures of Rule 9(b)). Rather, the Credit Unions had to plead facts specifically and plausibly demonstrating the defendants knew what they said was wrong at the time they said it.

Moreover, as we earlier noted, to plausibly plead fraud by omission in a securities-related fraud case, a plaintiff must "first identify a statement made by defendants, show how the omission rendered that statement misleading, and finally establish that there was a duty to disclose the omitted information." Ponsa-Rabell, 35 F.4th at 34. However, "[o]ur case law is clear" that "[i]t is not a material omission to fail to point out information of which the market is already aware." Id. at 35 (quoting Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004)). There is no "duty to repeat information already known or readily accessible to investors." Id. Circular Letter 2012-02 justified the Credit Unions' purchase of government bonds at a higher rate than usual by explicitly pointing out the Commonwealth's state of economic recession. Therefore, we can infer that the Credit Unions, when making their investment decisions, were made aware, by the defendants, of the fact that the economy in Puerto Rico was not at its strongest point.[15] We also know (because the plaintiffs told

---

[15] Although the defendants do not present any argument that the Credit Unions were sophisticated purchasers of the securities, we have previously noted a plaintiff's level of sophistication when evaluating the reasonableness of the investors' reliance on the alleged misrepresentations in a Puerto Rico fraud claim. See Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 59, 64-65 (1st Cir. 2020) (concluding on summary judgment for the plaintiff's Puerto Rico statutory deceit claim that no jury could find the buyer-plaintiff reasonably relied on the defendant's false statement given the plaintiff's sophistication as a buyer); P.R. Elec. Power Auth., 515 F.3d at 67 (reasoning that PREPA's sophistication was one reason it could not have reasonably relied

- 24 -

us) that they actively proposed ways to mitigate the financial issues the Commonwealth faced; they allege they accepted invitations from the government to discuss Puerto Rico's debt which culminated in a legislative proposal, adopted into law in December 2015.

Wrapping up this aspect of the Credit Unions' appeal, as we stated above, specificity is the name of the game when alleging fraud, and the Credit Unions have not filled the bill here. See Synopsys, Inc., 374 F.3d at 29-30 (affirming dismissal of misrepresentation claim when allegations sketched a scheme to mislead the plaintiff and withhold information without specifying "who allegedly uttered the misleading statements, to whom they were made, where they were made, when they occurred, and what actions they engendered"). Nor have they helped us understand how the allegations they have made are sufficient in the context of our binding precedent to survive the defendants' motions to dismiss for failure to state a plausible claim. See Falmouth Sch. Dep't, 44 F.4th at 47 (affirming the dismissal of statutory counterclaims in part because the "laundry list of allegations" recited in the complaint, even when considered as a whole picture, were too conclusory and the cross-appellant failed to cite to any analogous case for support). We agree with the district court's conclusion

---

on the defendant's alleged misrepresentation for PREPA's fraud claim).

that the "allegations here amount to conclusory assertions that fraud occurred at unspecified meetings attended by unspecific individuals over a four-year period." So we affirm the dismissal of the fraud-based counts for not meeting the requirements of Rule 9(b).[16]

---

[16] Part of the Credit Unions' count 1 claim seeking an exception to discharge of their Title III bankruptcy claims is premised upon the GDB's debt restructuring plan completed in 2018. Pursuant to Title VI of PROMESA (PROMESA § 601), in 2018 the district court issued an order approving a Qualifying Modification ("QM") to restructure the GDB's debts. PROMESA provides that a QM may issue after a consultation between the bond issuer and holders, resulting in a voluntary agreement reviewed and approved by the FOMB as meeting specific statutory criteria. 48 U.S.C. § 2231(a), (g). PROMESA also provides that a QM "will be conclusive and binding on all holders of Bonds whether or not they have given such consent." Id. at § 2231(m) (emphasis added). The district court concluded that the Credit Unions' request for exception from discharge from debts owed to them by the GDB was moot because the GDB had already modified its debts pursuant to the approved QM.

Before us, the Credit Unions contend the district court's mootness conclusion is wrong because they were not GDB bondholders at the time of the QM, and they say the SAC timely questions (through its allegations of fraudulent conduct on the part of the defendant-debtors) whether the QM is binding on them. Contrary to the assertions in the plaintiffs' briefing, however, the SAC includes information that the Credit Unions were in fact bondholders when the QM was approved. The Credit Unions also admitted during oral argument that some of them -- though perhaps not each -- were indeed bondholders at the time of the QM. Even if the Credit Unions' fraud claims were adequately pled, we agree with the GDB that the Credit Unions were bondholders at the time of the QM process such that the completion of this process rendered the Credit Unions' subsequent request for exception from discharge moot. See Redfern v. Napolitano, 727 F.3d 77, 83-84 (1st Cir. 2013) ("[F]ederal courts 'lack constitutional authority to decide moot questions'" when, for example, "the issue[] presented [is] no longer live." (first quoting Barr v. Galvin, 626 F.3d 99, 104 (1st Cir. 2010), then Maher v. Hyde, 272 F.3d 83, 86 (1st Cir. 2001))).

- 26 -

**Puerto Rico Claims Time-Barred**

In counts 4 and 5, the Credit Unions set forth claims for negligence and fraud against the Commonwealth, COSSEC, and the GDB, citing P.R. Laws Ann. Tit. 31, §§ 3018, 3019, 3020, 3021, 3408, and 5141.[17]  In addition to moving to dismiss these counts as not plausibly pled, the defendants also argued that the statutes of limitations for each count expired prior to the Credit Unions' initiating this adversary proceeding.  Agreeing with the defendants, the district court dismissed these claims pursuant to Rule 12(b)(1), reasoning that the statutes of limitations for each of these claims were either one year, see P.R. Laws Ann. Tit. 31, § 5298 (providing a one-year statute of limitation for "[a]ctions to demand civil liability . . . for obligations arising from the fault or negligence mentioned in § 5141 of this title, from the time the aggrieved person had knowledge thereof"), or two years for the securities-related fraud claims, see PaineWebber Inc. of P.R. v. First Bos. (P.R.) Inc., 136 P.R. Dec. 541, 545-46 (P.R. 1994) (certified translation at 3-4)).  Continuing, the district court concluded the Credit Unions were aware of their potential claims for damages by December 2015 because, as alleged in the SAC, they proposed and drafted legislation "to provide stability

---

[17] The Credit Unions tagged count 4 as "breach of contractual obligations" but the allegations claim fraudulent inducement into agreements and negligence and cite statutes governing fraud and negligence.

to the [financial] system." The district court noted that the Credit Unions did not dispute that their claims were governed by either a one- or two-year statute of limitations. Instead, they argued that equitable tolling should apply because the Credit Unions diligently pursued their rights and extraordinary circumstances such as Hurricane Maria got in the way of a timely filing.

Before us, the Credit Unions argue anew that the applicable statutes of limitations are equitably tolled, emphasizing again that the SAC spells out the variety of their efforts from 2015 to the present to work with the defendants about the financial crisis and the Credit Unions' losses therefrom, including conversations with various government agencies and the FOMB, and that the defendants know "firsthand" about these efforts and will be able to review materials related thereto during the discovery process. Nonetheless, the district court concluded the Credit Unions' efforts to work with the agencies did not excuse them "from timely pursuing litigation with respect to claims related to their known injury."

We have already affirmed the dismissal of the fraud-based part of counts 4 and 5 pursuant to Rule 12(b)(6), but to the extent these two counts include non-fraud related claims (i.e., negligence based on Puerto Rico law), we briefly review, and reject, the Credit Unions' equitable tolling arguments.

"Equitable tolling is available 'in exceptional circumstances' to extend the statute of limitations." Vistamar, Inc. v. Fagundo-Fagundo, 430 F.3d 66, 71 (1st Cir. 2005) (quoting Neverson v. Farquharson, 366 F.3d 32, 40 (1st Cir. 2004)). However, "[e]quitable tolling, if available at all, is the exception rather than the rule; resort to its prophylaxis is deemed justified only in extraordinary circumstances," id. (quoting Delaney v. Matesanz, 264 F.3d 7, 14 (1st Cir. 2001)), such as "when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands," id. at 72 (quoting González v. United States, 284 F.3d 281, 291 (1st Cir. 2002)). The Credit Unions rely on the hurricane as the basis for their entitlement to equitable tolling. Taking as true their allegations of actual loss on the bonds in 2015 and of their efforts to work with the government at that time to mitigate that loss, the one-year statutes of limitations for their negligence-based claims expired prior to the hurricane in the fall of 2017. Equitable tolling, therefore, cannot rescue from dismissal the untimely non-fraud-based part of counts 4 and 5.

## Takings Claim

In the SAC, the Credit Unions allege that the defendants used "regulatory powers" to take "material portions of Plaintiffs' cash and liquid assets," resulting in "illegally appropriat[ing] the moneys of the Cooperatives to finance the government operation" by providing "materially diminished and value impaired government

papers that did not constitute just compensation."[18]  According to

the plaintiffs, the defendants used the circular letters to compel

the Credit Unions "to purchase knowingly materially diminished and

value impaired government bonds," "depriv[ing] the Cooperatives'

property of any significant economic value."  The Credit Unions

allege the defendants' actions resulted in both a per se physical

taking and a categorical regulatory taking.

_____

[18] A brief overview of takings claims in general may be helpful here.  "The Takings Clause of the Fifth Amendment provides that 'private property [shall not] be taken for public use, without just compensation.'"  Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 27 (1st Cir. 2007) (quoting U.S. Const. amend. V).  "To make a cognizable claim of a taking in violation of the Fifth Amendment, the plaintiffs must first show that they possess a recognized property interest which may be protected by the Fifth Amendment."  Id. (quoting Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 973 (1st Cir. 1993)).  "Assuming that the plaintiff can establish a constitutionally protected property interest, the plaintiff must next show that the challenged action 'caused an illegal taking of that interest.'"  Id. (quoting Wash. Legal Found., 993 F.2d at 974) (cleaned up).  "The Supreme Court has recognized two types of takings:  physical takings and regulatory takings."  Id. at 27-28.  "A physical taking occurs either when there is a condemnation or a physical appropriation of property."  Id. at 28 (quoting Philip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir. 2002) (en banc)).  "Physical takings challenges 'involve the straightforward application of per se rules,' which means that 'when the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner.'"  Id. (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 322 (2002)) (cleaned up).  "A regulatory taking transpires when some significant restriction is placed upon an owner's use of his property for which 'justice and fairness' require that compensation be given."  Philip Morris, 312 F.3d at 33 (quoting Goldblatt v. Hempstead, 369 U.S. 590, 594 (1962)).  "When a regulation denies all economically beneficial or productive uses of land, it is a taking."  Id. (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992)).

The defendants moved to dismiss this count as not stating a plausible takings claim against them because the Credit Unions alleged a post-purchase reduction in value of the bonds and because a taking cannot occur unless the government's seizure of the property in question destroys the entire value of the property. The district court concluded the Credit Unions had not plausibly alleged that "COSSEC's regulatory actions coerced or forced a taking of the [Credit Union]'s property" because the two circular letters upon which the plaintiffs specifically rely used permissive language not mandatory language -- language that made clear the ultimate decision whether to purchase the securities was up to the Credit Unions.

Before this court, the Credit Unions argue that they plausibly alleged their takings claim under both takings theories.[19] What their arguments boil down to is an assertion that the district court failed to connect the dots the plaintiffs plotted across the SAC which, according to the plaintiffs, "paints a complete picture of a scheme designed to impose 'irresistible

_____

[19] The Credit Unions also argue that the defendants' actions amount to a non-categorical regulatory taking pursuant to the three-factor analysis described in Penn. Cent. Transp. Co. v. City of N.Y., 438 U.S. 104 (1978), arguing why their allegations are sufficient to plausibly plead this alternative takings theory. Problem is, the Credit Unions specifically alleged a direct taking and categorical regulatory taking in the SAC but not a non-categorical regulatory taking. So we'll say no more on this part of their takings argument.

pressure' over the[m] . . . [;] a scheme that was made up of several components, which should be analyzed jointly." Similar to the basis for the fraud claims, these dot "components" include the two Circular Letters (though the Credit Unions conceded at oral argument that the express language authorized -- but did not mandate -- the bond purchases) plus allegations that several other circular letters issued between 2009 and 2012 (the contents of these additional letters are not provided), that COSSEC often announced policy changes through circular letters, and that compliance with the letters is mandatory and subject to COSSEC's enforcement. These components, say the Credit Unions, provide sufficient factual information from which the district court should have -- and we must -- reasonably infer that the "known effect of the [l]etters, regardless of [their] particular formal language, was to coerce or force the [Credit Unions] to follow their content, even if seemingly painted as mere suggestion." In this way, say the Credit Unions, the defendants knew the letters would "apply irresistible pressure over the[m to purchase the bonds] without having to expose themselves through an outright command to purchase the bonds." The Credit Unions insist this whole picture, viewed properly and as adequately sketched in their

complaint, is enough for their takings claim (under either takings theory) to survive the motion to dismiss.[20]

---

[20] During oral argument, we tried to pin down the Credit Unions' precise theory about what property had been taken and how because the Credit Unions did not allege a complete loss of their entire investments but instead the SAC repeatedly mentions the "materially diminished and value impaired government instruments." The problem there is that our court has long held that "per se regulatory takings occur where the regulations completely deprive an owner of all economically beneficial use of her property," Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 126 (1st Cir. 2009) (cleaned up, citations omitted), not simply a diminution in value. In addition, a plaintiff needs to allege the complete loss of a specific interest in the property taken. See Parella v. Ret. Bd. of R.I. Emp. Ret. Sys., 173 F.3d 46, 58 (1st Cir. 1999) ("plaintiffs must first establish an independent property right before they can argue that the state has taken that right without just compensation") (citing Eastern Enter. v. Apfel, 524 U.S. 498 (1998)); see also In re Fin. Oversight & Mgmt. Bd., 41 F.4th 29, 41-42 (1st Cir. 2022) (where all parties agreed "that the Commonwealth (or one of [its] instrumentalities . . . ) took private property" -- i.e., money -- from the takings claimants"). The Credit Unions are instead laser-focused on the manner of the taking being the totality of the circumstances present at the time they purchased the bonds; the circumstances including the combined coercive force of the circular letters and the multi-faceted relationship they are locked into with COSSEC.

As best we can tell, based on closely examining the SAC, the Credit Unions' takings claim theory seems to be that they were compelled to spend more on the bonds than the bonds were worth on the date of purchase. Problem is, merely alleging in the SAC an after-purchase decline in the value of the bonds in support of this theory does not, in and of itself, mean the bonds were not worth what the Credit Unions paid at the time of purchase. And relatedly, the allegations in the SAC about what the government and its instrumentalities knew at the time the Credit Unions purchased the bonds are all no-meat-on-the-bones conclusory in nature, e.g., the "instruments lacked true value," and the defendants pushed the bonds "with full knowledge of the government's lack of financial capacity to pay." See Ocasio-Hernández, 640 F.3d at 11-12 (to "show[] that the pleader is entitled to relief," the allegations need "enough detail to provide a defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests'") (first quoting Fed. R. Civ. P. 8(a)

In retort, the defendants point out that the Credit Unions simply have not alleged that they were required to purchase the bonds authorized or up to the authorized level provided in the circular letters. We agree, and emphasize that COSSEC's use of permissive language in Circular Letters 09-03 and 2012-02 plainly conflicts with the Credit Unions' allegations to the contrary and belies their claim that they had no choice but to purchase the bonds offered. See Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 n.3 (1st Cir. 2012) (stating the documents attached to the pleading can "trump the complaint's allegations if a conflict exists" between them). These letters did not instruct the Credit Unions to purchase the bonds. The only rational inference to be drawn from these two letters is that the defendants authorized and enticed the Credit Unions to purchase the bonds in an amount representing up to 30% of their liquid assets. "[W]here a property owner voluntarily participates in a regulated program, there can be no unconstitutional taking." Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 129 (1st Cir. 2009) (citing Garelick v. Sullivan, 987 F.2d 913, 916 (2d Cir. 1993)). The Credit Unions' allegations about the so-called mandatory nature of the circular

and then quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Ultimately, we need not determine the specific property interest at play here because we conclude the Credit Unions failed to plausibly plead coercion as the manner in which the government and related entities deprived them of any property interest.

- 34 -

letters in general and COSSEC's general authority to force compliance with regulations, taken as true, do not lead to the inference that the defendants actually forced or compelled the Credit Unions to purchase -- or would have punished the plaintiffs if they had not invested in -- the bonds authorized by the two letters specified in the SAC. Cf. Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 678-79 (1st Cir. 1998) (holding plaintiff was likely to succeed on its takings claim because a state statute mandating disclosure of products' ingredients list (a valuable trade secret) did not adequately safeguard against potential public access to the list and therefore functionally compelled the business to either disclose its trade secrets or withdraw from the market). Indeed, as the Credit Unions also alleged in the SAC, not all of the Credit Unions felt compelled to purchase the bonds -- almost a quarter of the Credit Unions did not purchase the bonds.

The Credits Unions' takings claim was properly dismissed under Rule 12(b)(6).[21]

---

[21] The Credit Unions also raise a couple of additional arguments in their attempt to revive their complaint which we acknowledge here but for various reasons find unpersuasive. First, they assert that the district court "abused its discretion" by entering the judgment dismissing the SAC a few weeks before entering its order confirming the Title III final plan of adjustment for the debts of the Commonwealth, the ERS, and the PBA (wherein the district court overruled the Credit Unions' objections to the final plan based in part on the dismissal of this adversary proceeding). The Credit Unions argue that the

**WRAP UP**

The district court's judgment is affirmed. Each party shall bear their own costs.

---

district court deprived them of due process because the dismissal of their adversary proceeding was not final (i.e., had not been reviewed by this court) when the district court relied on it to resolve their objections to the Title III plan, hamstringing the Credit Unions' efforts to litigate their claims against the defendants. As the defendants point out, the Credit Unions have not provided any support for their thinly briefed contention that the district court did anything wrong by adjudicating the motions to dismiss pending before it, and we conclude this issue is waived for lack of development. See Perea v. Ed. Cultural, Inc., 13 F.4th 43, 55 n.24 (1st Cir. 2021) ("[I]issues . . . unaccompanied by some effort at developed argumentation[ ] are deemed waived." (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))).

The Credit Unions also argue that the dismissal of the adversary proceeding effectively provided the Title III debtors with a free pass on their fraudulent actions and argue that if the Credit Unions were to prevail on their claims against the defendants in the adversary proceeding then they would be entitled to an exception from discharge in the Title III case pursuant to the Title III court's equitable power. The Credit Unions' arguments about why the Title III court should have excepted its claims from discharge are front and center in its appeal from the confirmation order in the Title III case (No. 22-1079) so we do not further address this argument here.